**BOSE CORPORATION, Appellant,**

v.

**QSC AUDIO PRODUCTS, INC., Appellee.**

**No. 01–1216.**

United States Court of Appeals, Federal Circuit.

June 14, 2002.

Charles Hieken, Fish & Richardson, of Boston, Massachusetts, argued for appellant. With him on the brief were Molly Mosley–Goren and Cynthia E. Johnson.

Barry J. Reingold, Perkins Coie LLP, of Seattle, Washington, argued for appellee. With him on the brief were Alice D. Leiner and Jessica L. Rossman.

Before CLEVENGER, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

CLEVENGER, Circuit Judge.

Bose Corporation ("Bose") appeals from the decision of the Trademark Trial and Appeal Board ("Board") dismissing its opposition to the application of QSC Audio Products, Inc. ("QSC") to register the mark POWERWAVE for amplifiers and power amplifiers. The Board concluded that there is no likelihood of confusion between POWERWAVE and two of Bose's marks, ACOUSTIC WAVE and WAVE. *Bose Corp.*, Opposition No. 109,664, 2000 WL 1759738 (TTAB Nov. 16, 2000). We have jurisdiction over Bose's appeal under 28 U.S.C. § 1295(a)(4). Because the Board erred in several respects in its analysis of the likelihood of confusion between the marks in suit, in particular failing to accord fame to the Bose marks, we reverse the Board's decision.

I

The Bose ACOUSTIC WAVE mark is registered and used for (a) "loudspeaker systems and music systems consisting of a loudspeaker system and amplifier and at least one of a radio tuner, compact disc player and audio tape cassette player" and (b) "loudspeaker systems." ACOUSTIC WAVE thus refers to a specific kind of loudspeaker system, one that includes one or more of a radio tuner, compact disc player, and audio tape cassette player. The mark also refers simply to "loudspeaker systems" without the narrowing reference to a radio tuner, disc player or tape cassette player.

The Bose WAVE mark is registered and used for goods including radios, clock radios, audio tape recorders and players, portable radio and cassette recorder combinations, compact stereo systems and portable compact disc players.

Bose also owns its house mark BOSE that frequently accompanies the ACOUSTIC WAVE and WAVE marks. For purposes of this litigation, QSC and the Board accept that the BOSE house mark enjoys extensive public recognition and renown and in trademark parlance is therefore "famous."

QSC applied to register the mark POWERWAVE for "[e]lectronic audio and video signal processing equipment, namely, amplifiers and power amplifiers." Bose opposed QSC's application on the ground that permitting QSC to apply the mark POWERWAVE to its amplifiers would lead to a likelihood of confusion as to the origin of the amplifiers, due to the class of Bose goods covered by its preexisting ACOUSTIC WAVE and WAVE marks. Where a likelihood of confusion exists as to the origin of goods traveling under a particular mark, that mark cannot be registered. *See* 15 U.S.C. § 1052(d) (2000)

(granting authority to refuse registration to a trademark that so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive"); *Lloyd's Food Prods., Inc. v. Eli's, Inc.*, 987 F.2d 766, 767, 25 USPQ2d 2027, 2028 (Fed.Cir.1993).

## II

■ *In re E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), sets out numerous factors relevant to reaching a decision as to whether a likelihood of confusion exists with regard to competing marks. *Id.* at 1361, 476 F.2d 1357, 177 USPQ at 567. Each of the *DuPont* factors presents a question of fact, findings with regard to which we test for substantial evidence when called into question on appeal. *See Recot Inc. v. Becton*, 214 F.3d 1322, 1326–27, 54 USPQ2d 1894, 1896–97 (Fed.Cir.2000) (citing *Dickinson v. Zurko*, 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999), *In re Gartside*, 203 F.3d 1305, 1315, 53 USPQ2d 1769, 1775 (Fed.Cir.2000)). The ultimate question of whether a likelihood of confusion exists is, however, a question of law, an issue upon which we apply plenary review. *Id.* (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569, 218 USPQ 390, 394 (Fed.Cir.1983)). Our precedent establishes that the determination of a likelihood of confusion does not require examination and findings as to each and every *DuPont* factor. *See Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 352, 22 USPQ2d 1453, 1456 (Fed.Cir.1992) (explaining that different *DuPont* factors may play dominant roles in determining likelihood of confusion depending on the evidence in each case). In practice, the scope of examination by the Board in any particular case will ordinarily be established by the record presented by the parties. Here, the ultimate legal question is framed by the inquiry into four of the

*DuPont* factors: fame of the opposer's mark or marks; similarity or relatedness of the goods in question; commonality of the channels of trade through which the goods in question pass; and comparison for similarity of the marks themselves. The burden of proof rests with the opposer, *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1359, 57 USPQ2d 1720, 1721 (Fed.Cir.2001), and thus it fell to Bose to produce sufficient evidence to support the ultimate conclusion of likelihood of confusion.

The Board decided that Bose is not entitled to claim fame for its ACOUSTIC WAVE and WAVE marks, and that Bose had failed to produce sufficient evidence to demonstrate similarity or relatedness of the goods in question. Regarding the channels of trade, the Board found commonality, but concerning the marks themselves, the Board found distinct dissimilarity. On those findings of fact, the Board unsurprisingly concluded that Bose had failed to prove a likelihood of confusion, and therefore dismissed Bose's opposition. Bose timely appealed to this court.

## III

Bose asserts that the Board erred in its findings on each of the four *DuPont* factors, save with regard to the channels of trade, and consequently that it merits an outright reversal of the Board's decision and a judgment that its opposition is sustained. QSC naturally disagrees with Bose, arguing on each point in support of the Board's decision, save with regard to the channels of trade, for the reasons stated by the Board.

We first examine the Board's decision with regard to the alleged fame of ACOUSTIC WAVE and WAVE, then turn to the issues of similarity or relatedness of the goods, channels of trade, and appearance of the competing marks.

## A

■ Fame of an opposer's mark or marks, if it exists, plays a "dominant role in the process of balancing the *DuPont* factors," *Recot,* 214 F.3d at 1327, 54 USPQ2d at 1894, and "[f]amous marks thus enjoy a wide latitude of legal protection." *Id.* This is true as famous marks are more likely to be remembered and associated in the public mind than a weaker mark, and are thus more attractive as targets for would-be copyists. *Id.* Indeed, "[a] strong mark ... casts a long shadow which competitors must avoid." *Kenner Parker Toys,* 963 F.2d at 353, 22 USPQ2d at 1456. A famous mark is one "with extensive public recognition and renown." *Id.*

■ Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion. Instead, our cases teach that the fame of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident. *See, e.g., Nina Ricci, S.A.R.L. v. E.T.F. Enters., Inc.,* 889 F.2d 1070, 1072, 12 USPQ2d 1901, 1902 (Fed.Cir.1989) (NINA RICCI for perfume, clothing and accessories: $200 million in sales, over $37 million in advertising over 27 years); *Kimberly–Clark Corp. v. H. Douglas Enter., Ltd.,* 774 F.2d 1144, 1146–47, 227 USPQ 541, 542 (Fed.Cir.1985) (HUGGIES for diapers: over $300 million in sales over 9 years, $15 million in advertising in one year); *Specialty Brands Inc. v. Coffee Bean Distribs., Inc.,* 748 F.2d 669, 674–75, 223 USPQ 1281, 1284 (Fed.Cir.1984) (SPICE ISLANDS for teas, spices and seasonings: $25 million annually in sales for spices, $12 million between 1959 and 1981 for tea, "several million" in advertising, in use for 40 years); *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1567–68, 218 USPQ 390, 392–93 (Fed.Cir.1983) (GIANT FOOD for supermarket services and food products: sales over $1 billion in one year, "considerable amounts of money" in advertising, 45 years use); *DuPont,* 476 F.2d at 1361, 177 USPQ at 567; *Planters Nut & Chocolate Co. v. Crown Nut Co.,* 50 C.C.P.A. 1120, 305 F.2d 916, 917–18, 134 USPQ 504, 506 (CCPA 1962) (MR. PEANUT DESIGN for nuts and nut products: $350 million in sales, $10 million in advertising over 10 years). As the foregoing precedent illustrates, we have consistently accepted statistics of sales and advertising as indicia of fame: when the numbers are large, we have tended to accept them without any further supporting proof.

Our precedent has also recognized the interaction of fame and the similarity or relatedness of goods when assessing the likelihood of confusion. In *Recot,* the goods in question (edible dog food snacks sold under the mark FIDO LAY, versus human snack food sold by the opposer under the mark FRITO–LAY) were completely unrelated. For that reason, the Board discounted the significance of the admitted fame of the FRITO–LAY mark. We held that the Board erred in such discounting, stating, "Indeed, it is precisely these circumstances which demand great vigilance on the part of a competitor who is approaching a famous mark, for as the present case illustrates, the lure of undercutting or discounting the fame of a mark is especially seductive." *Id.* at 1327–28, 54 USPQ2d at 1897.

■ In this case, Bose sought to prove the fame of its marks by reference to the volume of sales and advertising expenses of the products it sells and has sold under the ACOUSTIC WAVE and WAVE marks. It also sought to anchor the significance of those commercial indicia of fame with the record evidence of many widely-

distributed critical assessments of the marked products that greeted their arrival in the marketplace and continued thereafter.

With respect to ACOUSTIC WAVE, the uncontested evidence before the Board showed over 17 years of use on the products covered by the mark, with annual sales of over $50 million, which translates to approximately 50,000 units sold annually, given the $1000 price per unit of record, and approximately 850,000 units sold since the product debuted. Bose has spent more than $5 million annually to advertise the covered products. The text of virtually every advertisement for the product touts the advanced electronic concepts that produce the rich and full sound amplified from a relatively small device. Such text is clearly written for sophisticated consumers who, given the price tag, are likely to appreciate the technological advances represented by the product. The ACOUSTIC WAVE mark appears on the product and its packaging along with the famous BOSE house mark.

Bose has advertised the ACOUSTIC WAVE product nationwide in popular magazines and newspapers and with direct mail promotions sent to consumers. The product is sold directly from Bose, from Bose outlets and through independent mail order catalog companies such as American Express, Herrington, and Hammacher-Schlemmer. The record evidence demonstrates that the BOSE house mark frequently appears in the advertising and promotional materials. The product, however, is itself prominently identified as trademarked in the text of nearly every example of the record evidence. In the direct mail advertising and sales promotion material sent by Bose through the mail, the portion of the communication that calls for the order to be placed only refers to the ACOUSTIC WAVE product with its trademark, with no reference to Bose as a

mark appearing on the order form. The consumer, when placing a $1000 order, thus asks for the trademarked product.

We thus are not faced with a record on which substantially every reference to the marked product is joined with reference to the famous house mark. Instead, the consumer is presented through the advertising and other promotional material with frequent references to the marked product standing alone and apart from the famous house mark. The distinction between uniform coupling of the famous house mark with the product marks and communication to consumers that typically gives significant independent reference to the product apart from the house mark is important, because in the latter instance the consumer has a basis on which to disassociate the product mark from the house mark.

The ACOUSTIC WAVE product, a table-top loudspeaker music system with amplifier and radio tuner and either tape cassette deck or compact disc player, was greeted with widespread critical attention upon introduction. The record is replete with product reviews, both in the popular daily press in major cities and in a wide variety of magazines that target the audience for audio products. The critical attention focused on the ACOUSTIC WAVE device was nationwide. Examples cited in the record come from the *Boston Herald, Chicago Tribune, Metrowest Business Review, Stereo Guide, Consumer Electronics Show Daily, Sound and Vision, High Fidelity, Popular Science, The Atlantic,* and *Chicago.* The "radically new" product was described as "to put it mildly, unique." The ACOUSTIC WAVE product received special attention in 1987, when the inventor of the product was named Inventor of the Year by the Intellectual Property Owners Association. The ACOUSTIC WAVE product was identified as the com-

mercial embodiment of the invention for which the honor was given. The celebrated radio commentator Paul Harvey, quoted in the widely circulated Northwest Airlines magazine, stated that "Amar Bose is the Thomas Edison of our time." The magazine article profiled the inventor and showed a photograph of the ACOUSTIC WAVE product.

The WAVE product is a table-top radio, which is available with a built-in compact disc player. It sells in the range of $300–$500, and has been in the marketplace since 1993. This product has enjoyed vast commercial success, with current annual sales of $100 million (200,000 annual units at $500 each), and sales since inception of $250 million (500,000 units at $500 each). Current annual advertising expenses are over $30 million, with total advertising expenses since 1993 of over $60 million. Advertising for the WAVE radio also touts the technological feats of the product; it too is directed at the market of knowledgeable consumers. As with the ACOUSTIC WAVE product, the advertising and promotional and sales materials for the WAVE product frequently use the famous house mark in conjunction with the WAVE product mark. From the record before the Board and this court, it appears that Bose follows the same policy in marketing the WAVE device as it does when marketing the ACOUSTIC WAVE device. The consumer receives information that clearly identifies the WAVE product as separately marked, and when the consumer purchases directly from Bose, the transaction is on a form that identifies only the marked WAVE product. In nearly every record item of communication to the consumer concerning the WAVE product, there is prominent separate reference to the marked product. Consequently, here again we have a record that supports consumer identification of the marked product apart from the famous house mark.

Widespread critical attention comparable to that which greeted ACOUSTIC WAVE followed shortly after introduction of the WAVE radio. *Popular Science* magazine honored the WAVE radio with its "Best of What's New Award" in 1993, and *Business Week* magazine awarded the WAVE radio its "Best New Product of 1994." The record also discloses critical assessment of the WAVE product from many other widespread sources, including the *Chicago Tribune, San Francisco Chronicle, Lexington Herald–Leader, Radio World, Robb Report, United Features Syndicate, Middlesex News, The Christian Science Monitor,* and *The Oregonian.* In addition to the exposure to the WAVE product consumers received from these publications, the consumer was reminded of the critical assessments in direct mail communications from Bose, which referred to those assessments.

Notwithstanding the evidence regarding sales and advertising expenses for the products sold under the ACOUSTIC WAVE and WAVE marks and the voluminous evidence of nationwide critical notice of the marked products, the Board concluded that Bose had failed to carry its burden to prove fame for the two marks, and that the marks thus do not earn the broad scope of protection afforded by precedent. The Board only referred to the sales and advertising data, and did not give any weight to the vast evidence of public notice given to the marked products.

The Board relied on three points to explain its decision on fame. First, the Board stated that Bose had not introduced any direct evidence of consumer recognition of the fame of the marks.

Second, the Board stated that the BOSE house mark is used with the two product marks, and from that fact it concluded that:

Absent additional evidence regarding the nature and extent of promotion or consumer perception of the marks WAVE and ACOUSTIC WAVE apart from the admittedly famous BOSE mark, we cannot conclude that this evidence establishes the fame of these pleaded marks.

*Bose,* slip op. at 12, 2000 WL 1759738.

Third, the Board discounted the sales and advertising evidence for the product marks, standing alone, because those indicia of fame had not been placed in any context "from which to determine how substantial the figures are for these types of products." *Id.* We address each of the Board's grounds separately.

As to the absence of any consumer surveys, we note that a footnote to the Board's own statement recognizes that direct evidence, such as surveys, is not "required in order to determine whether a mark is famous." Indeed, as noted above, virtually all of our precedent attributing fame to a mark has done so through indirect evidence of the extent to which a mark has earned fame in the consumer marketplace. The fact that little reference is made in our precedent to public consumer polls or surveys is not meant to suggest that such evidence is not probative. Indeed, we think such direct evidence of consumer awareness of products and the marks they bear is preferable to indirect evidence of consumer recognition, from which inferences necessarily have to be drawn. But the absence of such evidence cannot, standing alone, establish lack of fame.

As to the question of independent significance, we note that the issue of fame for product marks that travel with famous house marks is new to this court. QSC argues that the Board is correct in creating tests to assure that product marks do not acquire fame simply as a matter of the long shadow cast by the accompanying famous house mark. QSC thus makes a strong point, because the consequences of conferring fame on a product mark are significant, even possibly outcome-determinative in contests as to the likelihood of confusion. Because fame plays such a dominant role in the confusion analysis, we think those who claim fame for product marks that are used in tandem with a famous house mark can properly be put to tests to assure their entitlement to the benefits of fame for the product marks. We also think that McCarthy puts the question correctly: "Whether or not a product mark always used with a house mark possesses a separate trademark significance depends on the manner of use and the commercial impression engendered by that use." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7.5 (4th ed.1999). Although McCarthy poses the question, he does not answer it.

■ If a product mark used in tandem with a famous house mark (in today's world, examples abound: INTEL PENTIUM, FORD MUSTANG, APPLE MACINTOSH, 'KELLOGG'S FROOT LOOPS') has independent trademark significance, it should not be a great burden to substantiate the point. As the Board indicated in this case, consumer awareness of the product mark apart from the fame of the associated house mark, whether demonstrated directly or indirectly, is a reliable test of the independence of the product mark from its parent house mark. The nature and context of promotion is an equally reliable measure of mark independence, as is the strength of the public reputation of the product mark.

We thus do not fault the Board for its insistence that Bose produce evidence that the product marks can properly be seen as independent of the famous house mark. We do fault the Board for its conclusion

that there is no evidence in the record to show that the Bose product marks stand independently from its famous house mark. As we have noted above, the record is replete with evidence of the critical attention that has been showered upon the products since their inception. The critical notice given to the products specifically notes the ACOUSTIC WAVE and WAVE marks separate from the Bose marks, and there is considerable record evidence of advertising and sales literature that also decouples the product marks from the famous house mark. This constitutes overwhelming evidence of the independent trademark significance of the product marks. In short, the Board applied a correct test but scored the test incorrectly. The Bose product marks stand apart from their house mark and are thus entitled to be assessed independently for their possible fame.

Finally, we confront the Board's rejection of the sales and advertising expenditures relating to the products that carry the ACOUSTIC WAVE and WAVE marks. The sheer numbers, recounted above, display indirect consumer awareness in two ways: first by the vast number of purchases that have been made of the marked products, and second by the extent to which the public has been bombarded with textually substantive advertising of the marked products. Yet the Board rejected these indicia of fame, stating that even such indicia must be put in some context to assure the reliability of the numbers as indicators of fame. Once again, we think the Board has the right idea, but the wrong execution of the idea.

Raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading. For example, a 30–second spot commercial shown during a Super Bowl football game may cost a vast sum,

but the expenditure may have little if any impact on how the public reacts to the commercial message. At the other extreme, handbills passed at little cost to millions of consumers (for example, to New Yorkers exiting subway stations) may amount to the kind of advertising that is probative of consumer recognition of a mark. Consequently, some context in which to place raw statistics is reasonable. The Board suggested that one form of such context would be the substantiality of the sales or advertising figures for comparable types of products. A tiny percentage of the market share for the product or a small share of advertising revenues for the product market could undermine the weight given to the figures for assessment of fame. Large market shares of product sales or large percentages of advertising expenditures in a product line would buttress claims to fame. Another context, not applied in this case by the Board, is the critical assessment or the general reputation of the marked product. In the latter category, consider the ROLLS–ROYCE mark for automobiles. We may safely assume that the annual sales figure for ROLLS–ROYCE automobiles (although each item is very expensive) is inconsequential even in the submarket of luxury automobiles, and likewise the advertising revenues for the mark. In one context, the statistics argue against fame for the ROLLS–ROYCE mark, but in the context of general reputation, the mark warrants fame in the public's eye.

In this case, the sales and advertising numbers for ACOUSTIC WAVE and WAVE have to be seen both in the context of how the products are presented in the advertising and sales material (here with sufficient independence from the famous house mark) and in the context of the continuous and extensive critical consideration the marked products have enjoyed. The record, described above, gives evi-

dence that the consuming public has been exposed frequently and nationwide to extensive descriptions of the two products. In these contexts, the sales and advertising numbers, our historic indicia of fame, are bolstered by overwhelming evidence of confirmatory context, and thus were incorrectly rejected by the Board.

When the full record is considered, only one conclusion can be reached regarding the fame of the Bose product marks: they are famous and thus entitled to broad protection.

### B

■ The second *DuPont* factor considered by the Board was the "similarity or dissimilarity and nature of the goods or services as described in an application or registration or in connection with which a prior mark is in use," *DuPont*, 476 F.2d at 1361, 177 USPQ at 567. The Board noted that the QSC application identified component parts, "amplifiers and power amplifiers," while the Bose ACOUSTIC WAVE and WAVE marks are registered and used for stand-alone systems. The Board concluded that this difference weighed against finding a likelihood of confusion. *Bose,* slip op. at 12–14, 18, 2000 WL 1759738. On this point, the Board erred.

The Board was, of course, correct in stating that QSC's goods, amplifiers and power amplifiers, refer to parts of sound systems, whereas the Bose products refer to complete products that are capable of producing sounds for consumers to hear. Hence the products as described in the pertinent registrations are not the same. But they are related, as required by *Du-Pont. DuPont*, 476 F.2d at 1361, 177 USPQ at 567. As the Board noted, the ACOUSTIC WAVE registration describes the product as including an amplifier. Indeed, the vast advertising for the product carefully describes the manner in which the novel technology of the product pro-

duces amplified sound. On the face of the registrations themselves, QSC's products and the ACOUSTIC WAVE product are related. The record does not contain substantial evidence to support a finding of dissimilarity with regard to those products. To the contrary, there is ample evidence of relatedness from the text of the registrations alone. When the text of the advertising for the ACOUSTIC WAVE product is considered, the conclusion of relatedness is inescapable. The consumers who purchase the Bose product cannot ignore the fact that it, like the QSC product, amplifies via an amplifier.

With regard to the WAVE product (whose unique sound amplification invites consumers to pay a premium price for the product), the evidence at first glance is less compelling that the product might be associated by consumers with QSC's amplifiers. But the WAVE products are stereo systems, albeit compact ones, and they are part of the general category of electronic sound products, as the Board recognized. The QSC products are also part of the same general category. The Board is correct, as a general proposition, in discounting the relatedness of the WAVE product to the QSC amplifiers on the rationale that a broad general market category is not a generally reliable test of relatedness of products. In this case, however, the record supplies some context to the general market category, and therefore affords it relevance. As noted above, the advertising for the WAVE product, like that for the ACOUSTIC WAVE product, consistently refers in detail to the sophistication of the product and the manner in which it amplifies the sounds it emits. Consumers confronted with the text of the Bose WAVE advertisements, and with the widely disseminated critical explanation and acclaim for the product, cannot but be aware that amplification of sound is at the heart of the product. Con-

sequently, even though the WAVE registration does not itself mention the word "amplifier," the record provides ample evidence that the goods in question are related.

In *Recot*, the goods in question, human snack food and pet snack food, themselves were completely unrelated. Nonetheless, we observed:

> Thus, even if the goods in question are different from, and thus not related to, one another in kind, the same goods can be related in the mind of the consuming public as to the origin of the goods. It is this sense of relatedness that matters in the likelihood of confusion analysis.

*Recot*, 214 F.3d at 1329, 54 USPQ2d at 1898. We also emphasized in *Recot* that when a product reaches the marketplace under a famous mark, special care is necessary to appreciate that products not closely related may nonetheless be confused as to source by the consumer because of the fame of the mark. Thus, a consumer may reasonably ask whether Bose, the source of undisputed innovative products that amplify sound in a manner previously unknown, including the WAVE product, might be the source of a POWERWAVE amplifier. Indeed, the record in this case discloses that Bose does market a component product known as the Acoustic Wave Cannon, which is a powerful bass speaker. As a participant in the component market, the consumer has to be aware that Bose offers many acoustic products. This evidence in the record provides further context to support relatedness of the WAVE sound system to the amplifiers offered by QSC.

The Board erred in concluding that the ACOUSTIC WAVE and WAVE products are not related to QSC's amplifiers.

### C

▮▮▮ The third *DuPont* factor evaluated is "[t]he similarity or dissimilarity of established, likely-to-continue trade channels." *DuPont*, 476 F.2d at 1361, 177 USPQ at 567. Before the Board, QSC argued that its products are currently sold exclusively on the professional market, in contrast with Bose products, which are sold on the consumer market. *Bose*, slip op. at 14, 2000 WL 1759738. The Board correctly rejected this argument. Registrability must be determined "on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of the goods are directed." *Octocom Sys., Inc. v. Houston Computer Serv., Inc.*, 918 F.2d 937, 942, 16 USPQ2d 1783, 1787 (Fed.Cir.1990).

As QSC's application contains no limiting language, the Board correctly concluded that its application for "video and audio signal equipment, namely amplifiers and power amplifiers" included both the professional and consumer markets. As a result, an overlap exists between the products of the opposer and the applicant. Indeed, QSC does not seriously contest this on appeal.

The evaluation of the similarity of trade channels thus weighs in favor of finding a likelihood of confusion.

### D

▮▮▮ Finally, the Board considered the similarity or dissimilarity of the marks. *See DuPont*, 476 F.2d at 1361, 177 USPQ at 567. Finding the Bose ACOUSTIC WAVE mark suggestive of sound waves, the Board concluded:

> [T]he term POWER in applicant's mark, POWERWAVE, while also suggestive of applicant's goods, leads to a different connotation, as well as a different appearance, than either of opposer's marks. This difference is sufficient to

create a distinctly different commercial impression than either of opposer's marks, when the parties' marks are considered in their entireties in connection with the respective goods.

*Bose,* slip op. at 17.

The Board does not identify the difference in connotation between the marks, nor does it identify any evidence supporting its conclusion. With respect to the Bose WAVE mark, the only Board finding is that it "can be considered a double entendre suggesting both sound waves and radio waves." *Id.* The Board does not identify how this is relevant to a finding of dissimilarity between the POWERWAVE and WAVE marks.

The presence of the root element WAVE, upon this court's review, introduces a strong similarity in all three marks. Whatever additional distinction may be introduced by the element of POWER in the QSC POWERWAVE mark is severely limited by the fact that the mark is applied to acoustic equipment, namely amplifiers. For this reason, the overall commercial impression engendered by the use of the POWERWAVE mark also carries a strong connotation of sound waves, corresponding to the Board's findings with respect to ACOUSTIC WAVE and WAVE. Any examination of the record before the Board reveals that the "wave" portion of the Bose marks refers to sound and the unique way in which it is manipulated in the Bose products to produce the end product, sound. "Wave" thus has meaning, and in this instance the newcomer, QSC, seeks to nestle close to the fame-benefited Bose marks.

The Board itself, other courts and this court have been confronted frequently with situations similar to this one, in which a competing mark shares a core portion of senior marks, and in which the competing mark was found too similar to the other mark to earn mark status for itself. *See*

McCarthy, *supra,* § 23.29. Typical of the marks found similar in sound and connotation are AQUA–CARE and WATER–CARE, BEER NUTS and BREW NUTS, BLUE SHIELD and RED SHIELD, GENTLE TOUCH and KIND TOUCH, MANPOWER and WOMANPOWER, DOWNTOWNER and UPTOWNER, WEED EATER and LEAF EATER, THERMO KING and ZERO KING. *Id.*

On the record before us, we conclude that a proper evaluation of the similarities of the QSC and Bose marks in their entireties weighs in favor of a finding of a likelihood of confusion.

## IV

When the record is correctly analyzed, the two Bose product marks are entitled to the benefits of fame that our precedent confers. They are thus entitled to a wide berth, upon consideration of whether consumers are likely to be confused as to the source of QSC's amplifiers. When the Board's error as to fame is coupled with its errors in considering the relatedness of the goods and the similarity (or dissimilarity) of the marks themselves, and when the Board's correct finding regarding channels of trade is factored into the equation, there can be no question that Bose is entitled to judgment sustaining its opposition to QSC's application.

## CONCLUSION

We consequently reverse the Board's decision, holding that a likelihood of confusion exists, sustaining Bose's opposition, and denying QSC's registration of its POWERWAVE mark.

REVERSED.