**THIS OPINION IS A PRECEDENT
OF
THE T.T.A.B.**

Mailed: February 27, 2015

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## Trademark Trial and Appeal Board

_____

Fiserv, Inc.

v.

Electronic Transaction Systems Corp.

_____

Opposition No. 91214266

_____

Katrina G. Hull and Erica Jeung Dickey of Michael Best & Friedrich LLP, for Fiserv, Inc.

Michael P. Fortkort and Andrew C. Sensi of Michael P. Fortkort PC, for Electronic Transaction Systems Corporation.

_____

Before Cataldo, Mermelstein, and Ritchie, Administrative Trademark Judges.

Opinion by Ritchie, Administrative Trademark Judge:

On April 29, 2013, Electronic Transaction Systems Corporation ("Applicant")

applied to register PMONEY,[1] in standard character form, for

> providing electronic processing of electronic funds transfer, ACH,
> credit card, debit card, electronic check and electronic payments,

---

[1] Application Serial No. 85917072, alleging dates of first use and first use in commerce on January 26, 2011.

in International Class 36. On December 31, 2013, Fiserv, Inc. ("Opposer") filed

an opposition to the registration of Applicant's mark on the ground that

Applicant's mark is likely to cause confusion with Opposer's marks. Opposer

asserted that it owns Registration Nos. 3848688 for POPMONEY,[2] in standard

character form, and 3867315 for POPMONEY, and design,[3] as shown below,

both for

> financial services, namely, electronic funds transfer, direct electronic debit transactions, electronic payment processing services, electronic commerce merchant payment services, peer to peer electronic payments, and peer-to-peer money transfers,

in International Class 36:



Opposer also asserted that it owns Registration No. 4386981 for

POPMONEY[4] in standard character form for

> downloadable computer software to enable users to initiate banking and financial transactions via a wireless communication device, namely, software to initiate electronic funds transfers, electronic payments, person-to[-]person money transfers, and person-to-person electronic payments; downloadable computer software to enable users to access transaction and account information in connection with electronic funds transfers and electronic payments,

in International Class 9; and

---

[2] Registered September 14, 2010.

[3] Registered October 26, 2010.

[4] Registered August 20, 2013.

> software as a service (SaaS) services featuring software to enable users to initiate banking and financial transactions, namely, software to initiate electronic funds transfers, electronic payments, person-to-person money transfers, and person-to-person electronic payments; software as a service (SaaS) services featuring software to enable users to access transaction and account information in connection with electronic funds transfers and electronic payments,

in International Class 42.

In its Answer, Applicant denied the salient allegations of the notice of opposition, except that it admitted information regarding its address and state of incorporation (para 1), that it had filed a "use-based application," (para 2) and that "Applicant does not have permission from Opposer to use or register Applicant's Mark." (para 15).

As discussed herein, the parties elected to adopt the Board's Accelerated Case Resolution ("ACR") procedure to streamline their pre-trial and trial procedures and reduce the pendency of this proceeding. Following the guidelines they set forth by stipulation, as discussed further below, both parties filed briefs, and Opposer filed a reply brief. In accordance with the schedule set by the parties, which they maintained, the time from notice to briefing took less than a year.

## The Record and ACR Procedural Background

The Board highly commends the parties for their decision to resolve this case via the efficient means of an ACR procedure, particularly as they elected to do so quite early in the proceeding, which then avoided expensive and time consuming motion practice and resulted in a clean and concise record. On April 14, 2014,

four days after Initial Disclosures were due, the parties filed a Stipulation for

Accelerated Case Resolution ("Stipulation for ACR"). The Stipulation for ACR

stated as follows:

> Opposer, Fiserv, Inc. ("Opposer"), by its undersigned counsel, and Applicant, Electronic Transaction Systems Corporation ("Applicant"), by its undersigned counsel, stipulate to resolving the above-captioned Opposition through the Board's Accelerated Case Resolution ("ACR") procedure. The Parties have conferred with one another, agree to forgo discovery and waive disclosures, and respectfully request that the Board enter an order instating ACR and adopting the following ACR schedule:
>
> June 1, 2014 – Opposer serves Applicant with proposed Stipulation of Facts;
>
> July 1, 2014 – Applicant serves Opposer with additions and revisions to the proposed Stipulation of Facts;
>
> July 15, 2014 – Parties file Stipulation of Facts with the Board, or schedule call with interlocutory attorney to discuss progress and whether ACR should continue;
>
> September 15, 2014 – Opposer files ACR brief and evidence with Board;
>
> October 15, 2014 – Applicant files ACR brief and evidence with Board; and
>
> November 5, 2014 – Opposer files rebuttal ACR brief and evidence with the Board.

We note that the parties took into account in the schedule set forth in their

Stipulation for ACR the possibility that if ACR did not turn out to be the best

route for them, then they could opt out of it later. They also took appropriate

advantage of conferences with the Board, holding a case conference with the

interlocutory attorney first on April 10, 2014 to discuss their Stipulation for

ACR, and then again on October 28, 2014 regarding a dispute that arose regarding the Stipulation of Facts (as discussed below), which the parties resolved and amended accordingly.

Pursuant to the Stipulation for ACR, on July 15, 2014, the parties filed a Stipulation for Certain Facts to Be Entered into the Record and for Certain Documents and Testimony be Admitted into Evidence ("Stipulation of Facts"). The Stipulation of Facts consists of 37 numbered paragraphs and is followed by Exhibits A through Y, for a total of 593 pages in 7 TTABVUE, as well as a number of pages in the confidential record in 8 TTABVUE, comprised of Exhibits I (Opposer's client list) and K (Opposer's marketing examples) and redacted sales and income information from both parties.[5] Pursuant to the October 28, 2014 case conference, the parties submitted a short amended stipulation of facts consisting of amendments to paragraphs 10 and 11 only ("Amended Stipulation of Facts") in 13 TTABVUE, accompanied by a corresponding confidential amended stipulation of facts. Applicant also included evidence with its brief, as contemplated by the Stipulation for ACR, consisting of Exhibits 1 through 3.[6] Neither party submitted testimony apart from the stipulated facts.

---

[5] Record citations are to the Trademark Trial and Appeal Board's (TTAB) publicly available docket history system TTABVUE. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[6] We note that the parties did not specify any parameters for objecting to evidence filed with briefs. Opposer did not object to Applicant's evidence.

Accordingly, pursuant to the parties' agreement, the record consists of the Stipulation of Facts, and the Amended Stipulation of Facts, as well as the confidential information filed therewith; and the evidence filed by Applicant with its brief. By operation of law, the record also contains the pleadings and the file of the involved application. Trademark Rule 2.122 (a), (b); 37 CFR § 2.122 (a), (b).

**Priority and Standing**

Standing is a threshold issue that must be proven in every *inter partes* case. *See Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982) ("The facts regarding standing . . . must be affirmatively proved. Accordingly, [plaintiff] is not entitled to standing solely because of the allegations in its [pleading]."). To establish standing in an opposition, an opposer must show both "a real interest in the proceedings as well as a 'reasonable' basis for his belief of damage." *See Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999).

The Stipulation of Facts states that Opposer is the owner of the three pleaded registrations, Registration Nos. 3848688, 3867315, and 4386981. (Stip. of Facts, at para. 1). It also states that "Opposer has been using the trademark POPMONEY" in connection with software including "software to initiate electronic funds transfers" since "at least as early as December 13, 2009" (*id.* at para. 2) and in connection with "electronic funds transfer" since "at least as early as April 20, 2010." *Id.* at para. 3. The parties also attached to their

Stipulation of Facts status and title copies of Opposer's three pleaded registrations, as a result of which, Opposer has established its standing as well as its priority with respect to the marks and the services set out therein. *See King Candy Co. v. Eunice King's Kitchen,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

We find, therefore, that Opposer has established its standing and priority in this proceeding.

## Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the relevant, probative evidence in the record related to a likelihood of confusion. *See In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973); *see also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Co.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); and *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *See Federated Foods, Inc. v. Fort Howard Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and

differences in the marks."). We discuss the *du Pont* factors for which there is relevant argument and evidence.

For purposes of our likelihood of confusion analysis, we focus on pleaded Registration No. 3848688 (POPMONEY in standard characters). We find this mark to be the most relevant of Opposer's pleaded registrations for our *du Pont* analysis. Accordingly, if we find a likelihood of confusion as to this pleaded registration, we need not find it as to the others. On the other hand, if we don't reach that conclusion, we would not find it as to the other pleaded registrations either. *See In re Max Capital Group Ltd.,* 93 USPQ2d 1243, 1245 (TTAB 2010).

<u>The Services and Channels of Trade</u>

The identification of services covered by Opposer's Registration No. 3848688 for POPMONEY includes "financial services, namely, electronic funds transfer, direct electronic debit transactions, electronic payment processing services, electronic commerce merchant payment services, peer to peer electronic payments, and peer-to-peer money transfers." The identification of services in the application is "providing electronic processing of electronic funds transfer, ACH, credit card, debit card, electronic check and electronic payments." Both include "electronic funds transfer" as well as electronic "debit" services. Applicant admits this is a "small overlap." (Appl's brief at 8). Indeed, the identifications overlap and are identical-in-part.

Because the services described in the application and the cited registration are identical-in-part, we must presume that the channels of trade and classes of

purchasers overlap as well. *See Cunningham*, 55 USPQ2d at 1846-47 (Federal Circuit found substantial evidence supported Board determination that parties' goods would be offered to same purchasers in same channels of trade, based on "identical in part" and otherwise closely related goods) and *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers"). *See also, Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1005 (Fed. Cir. 2002) ("absent restrictions in the application and registration, [related] goods and services are presumed to travel in the same channels of trade to the same class of purchasers").

Applicant admits, again, that, in concluding that the services are identical-in-part, "the Board *could* conclude that Applicants [sic] Services would also travel though [sic] the same trade channels to the same consumers as Opposer's Goods and Services." (Appl's brief at 8). Applicant further admits that there is at least some actual overlap in the marketplace between the parties' channels of trade. *Id.* at 9. ("The only overlap in consumers and trade channels occurs where the parties offer mobile applications for download through Google Play and Apple's iTunes Store."). Although Applicant does not note any further marketplace overlap in the channels of trade, it bears mentioning that there are no restrictions in the identifications of services as to the parties' respective channels of trade. *See Octocom Systems, Inc. v. Houston Computers Services Inc.*,

918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed.") (citations omitted)**.** Indeed, Applicant may offer its "electronic funds transfer" service to the same general consumers, merchants, or banks via the same advertising methods. Thus, not only are the in-part identical services presumed to be offered in the same trade channels to the same classes of consumers, the plain language of the parties' recitations of services supports such a presumption and Applicant acknowledges the existence of some overlap.

Accordingly, we find that these factors weigh heavily in favor of finding a likelihood of confusion.

The Marks

Preliminarily, we note that when the services at issue are identical or as here identical-in-part, the degree of similarity between the marks which is required to support a finding of likelihood of confusion is less than if the services were not identical. *In re Viterra Inc.***,** 671 F.3d 1358, 101 USPQ2d 1905, 1912 (Fed. Cir. 2012) (citing *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874**,** 23 USPQ2d 1698 (Fed. Cir. 1992)). We consider and compare the appearance, sound, connotation and commercial impression of the marks in

their entireties. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).

The mark in Registration No. 3848688 is POPMONEY. Applicant asserts that the letters "POP" have a descriptive meaning with regard to the identified services of electronic payment services. (Appl's brief at 10). In support of this argument, Applicant submitted two websites that discuss or describe "POP" as "Point of Purchase," as follows:

> Investopedia: Point of Purchase-POP-Definition: A place where sales are made. On a macro-level, a point of purchase may be a mall, market or city. On a micro-level, retailers consider a point of purchase to be the area surrounding the counter where customers pay. Also known as "point of sale."
> *Investopedia.com*
> Attached as 17 TTABVUE 28

> J.P.Morgan: Receivables ACH Point-of-Purchase (POP) Check Conversion: Consumers continue to write checks at the time of purchase and processing these checks costs you time and money. With ACH Point-of-Purchase (POP) Check Conversion Service, eligible consumer checks are converted to ACH transactions at the time of the sale, so you can significantly reduce back-office labor costs, check deposit preparation and handling costs and check clearing fees.
> *Jpmorgan.com*
> Attached as 17 TTABVUE 30

In response, Opposer argued that two websites hardly serve to demonstrate that the term "POP" has a meaning as understood by relevant consumers to refer to its services. Rather, argues Opposer, the word "POP" has other meanings that consumers are more likely to understand in this context:

> Indeed 'POP' has many widely recognizable meanings, including 'to make a sudden, sharp, explosive sound,' such as a ballooning popping [sic], or 'to move or appear quickly or unexpectedly' such

as an image popping up on a screen. *Webster's II New College Dictionary (1995).* These common meanings of 'POP' as a sound or to appear quickly are the meanings most likely to come to the minds of consumers encountering the POPMONEY mark, not 'point of purchase.'"
(Reply at 5-6)

Given the paucity of evidence on the issue, we find insufficient support for Applicant's contention that "POP" has a descriptive meaning as applied to Opposer's services. It is equally likely that consumers will understand Opposer's POPMONEY mark in relation to its electronic funds transfer services in the manner noted in Opposer's reply brief. While perhaps suggestive, or even highly suggestive, on this record the term POPMONEY is nevertheless inherently distinctive.[7]

Applicant's mark is PMONEY. There is no indication that this has a particular meaning other than the letter "P" plus the term "MONEY." We find it likely that, with overlapping services, consumers will perceive PMONEY as an abbreviation of POPMONEY. *See In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 219 (CCPA 1978) (Rich, J., concurring: "the users of language have a universal habit of shortening full names – from haste or laziness or just economy of words"). As our case law further indicates,

> [C]ompanies are frequently called by shortened names, such as Penney's for J.C. Penney's, Sears for Sears and Roebuck (even before it officially changed its name to Sears alone), Ward's for Montgomery Ward's, and Bloomies for Bloomingdales.

---

[7] Absent a counterclaim, not present in this proceeding, Applicant may not pursue an impermissible collateral attack on Opposer's registration. *See* 37 C.F.R. § 2.106(b)(2)(ii).

*Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1333 (TTAB 1992) ; *See also Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 218 USPQ 390, 395 (Fed. Cir. 1983); *Big M Inc. v. The United States Shoe Co.,* 228 USPQ 614, 616 (TTAB 1985).

In sum, although we find the mark POPMONEY to be somewhat conceptually weak on the distinctiveness spectrum, it is still inherently distinctive, and the sight, sound, and commercial impression of the marks when compared in their entireties is substantially similar, particularly when considering that they are used on services that are identical-in-part.

This factor, too, weighs in favor of finding a likelihood of confusion.

Third-Party Use of Shared Term

Applicant has asserted that many third parties use the shared term "MONEY" for the same or similar services. At its core, the relevant question is whether so many third parties use the term shared between the marks that consumers will look to even very nuanced points of differentiation. *See In re Broadway Chicken Inc.*, 38 USPQ2d 1559, 1564 (TTAB 1996). In that case, the applicant submitted evidence that hundreds of businesses use the shared term for the services for which applicant sought registration.

Here, Applicant included a number of examples of use of the term "MONEY" for the services at issue. Examples include websites attached as exhibits to the Stipulation of Facts. Applicant also included USPTO printouts of third-party registrations with its brief. The term "MONEY" alone is undoubtedly a weak one

13

with regard to the identified services, since it is descriptive of, if not generic for the parties' services. We note, however, that there are few instances in these exhibits of use of the full shared term, which consists of the letter "P" plus "MONEY." Although they were not specifically laid out by Applicant, we found the following: (i) from Ex. U (labeled "search mobile wallet on Google Play") PIDO Mobile Money; (ii) from Ex. V (labeled "Similar Android apps") PIDO Mobile Money; Xpress Money; Money Manager—pMoney Line; Income and Expense; T2Expense-Money; Umpqua (Sterling); and (iii) from Ex. 2 to Applicant's brief (labeled "a list of 34 registrations and applications which include the term money and are registered in the same classes as Opposer's Registrations")[8] SWAP MONEY FOR ME; Registration No. 4440129; PURPOSE MONEY, and design, Registration No. 4307622; and MONEYPASS, Registration Nos. 2934476, 2934477, and 2826231. We do not find any of these marks to be as similar to the pleaded mark POPMONEY as is Applicant's PMONEY. Furthermore, there is no evidence that the shared term, consisting of the letter "P" plus "MONEY," is commonly used by third parties, or that it has an understood meaning in relation to the services apart from the separate term "MONEY" alone, such that consumers would look for nuanced points of differentiation.

We find this factor to be neutral.

---

[8] Printouts of the registrations were included in Exhibit 2 as well.

Fame and Market Strength

Opposer argues that its POPMONEY mark is a commercially strong mark. Opposer further asserts in its brief, referring to the Stipulation of Facts, and evidence attached thereto, that it has used the mark for over four years on the market; (Stip. of Facts Paras. 2-3); it has garnered five industry awards; *id.* at Para. 20, Ex. N; it received an endorsement from the American Bankers Association ("ABA"); *id.* at Para. 21, and Ex. O; and there are "hundreds of newspaper and magazine articles and news segments" featuring POPMONEY. *Id.* at Para. 18, and Exs. L and M. While these exhibits do include numerous articles from general interest publications that refer to POPMONEY and the relevant identified services, they do not cover more than the few years of time during which the mark has been in use. Examples include the following[9]:

> The New York Times; Bucks Blog; Sending Money Electronically to a Friend; Why it's hard; March 11, 2010; With Cash Edge's new service, consumers don't necessarily need to know the bank account number of the transfer recipient, which is required for some of the other bank transfer services on the market today. Instead, customers can send the transfer from their bank's Web site to the e-mail address, mobile phone number or account number of the recipient. A recipient receiving the transfer via e-mail or phone would then be directed to the service's Web site (PopMoney) to sign up to receive the transfer.
> *http://bucks.blogs.nytimes.com*
> 7 TTABVUE 400
>
> American Banker; With E-Transfers, Banks Target Gen-Y Payments; December 18, 2009; PNC was one of two banks that switched on P-to-P transfer tools this past Saturday night, using CashEdge Inc's POPmoney service, the first to do so since the New

---

[9] Some of these articles discuss POPMONEY under the ownership of Opposer's predecessor-in-interest, CashEdge, Inc.

York transfer technology provider introduced it in June.
*Americanbanker.com*
7 TTABVUE 379

Digital Transactions, The Sudden Allure of P2P; February 2010;
Neil Platt, senior vice president and general manager of banking
for CashEdge's U.S. banking division, points out that POPmoney,
which the company launched in June, builds off of the vendor's
TransferNow, a service used by about 400 banks.
*Digitaltransactions.com*
7 TTABVUE 384-385

BBR Banking Business Review: Bank of the West Selects
CashEdge P2P Payments Service Popmoney; May 27, 2010;
CashEdge claimed that its Popmoney payments service will allow
Bank of the West customers the ability to send money from their
bank account, using a recipient's email address, mobile phone
number or bank account information.
*http://payments.banking-business-review.com*
7 TTABVUE 433

Credit Union Times; Person-to-Person Offerings Proliferate,
Extend Service, Protect Turf; June 2, 2010; BECU is using the
Popmoney service from CashEdge, which he said differs from
PayPal from the member perspective in a number of ways. "They're
kind of a warehouse for money. They take the funds out and credit
the receiving party before the funds are moved, and you have to
establish an account with them."
*Cutimes.com*
7 TTABVUE 438

Payment News; US Bank Partners with CashEdge for Popmoney
Person-to-Person Payments; June 10, 2010; CashEdge and U.S.
Bank have announced that they are partnering to launch
CashEdge's person-to-person (P2P) online and mobile payments
service, Popmoney, later this year.
*Paymentsnews.com*
7 TTABVUE 445

FST Financial Services Technology; US Bank to offer P2P
Payments via CashEdge; June 11, 2010; US Bank will utilize
CashEdge's Popmoney service through usbank.com. "Unlike a wire
transfer or other previously available payment options, these new

alternatives would only require the payor to have their payee's e-mail address or mobile phone number."
*Usfst.com*
7 TTABVUE 449

FoxBusiness; Say Goodbye to Checks: Peer-to Peer Payments Gain Momentum; June 17, 2010; Fiserv isn't the only financial company launching P2P payment services. CashEdge of New York has its Popmoney P2P Payment service and in May announced Bank of the West is using the service.
*Foxsmallbusinesscenter.com*
7 TTABVUE 454

Youhire.com in Glenwood Landing: A job board as young as it feels; January 2014; Pay rates are set by the job providers and pay is deposited directly into a youhire's bank account through Popmoney.com upon job completion. A 15 percent fee is charged by Youhire.com from every transaction on the site.
*Long Island Business (Dolan Media Newswires)*
7 TTABVUE 171

Opposer further included in the confidential record information regarding its sales and advertising expenses. We do not find these numbers to be overwhelming, and as Applicant points out, no context was provided for how they compare to competitors. *Bose Corp. v. QSC Audio Prods.*, 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002) ("raw numbers alone in today's world may be misleading"). The Stipulation of Facts further notes that Opposer has been ranked by *American Banker* and *Bank Technology News* as "one of the top three companies worldwide on the FinTech 100 for the past 10 years." (Stip. of Facts at Para. 4). Again though, there is no explanation as to the meaning of this index or the breadth of consumer exposure thereto. It also notes, regarding Opposer's market exposure, that Opposer is the 2014 sponsor of the Public Relations Student Society of America ("PRSSA") Bateman Case Study

Competition which includes 75 colleges and universities. *Id.* at Para. 13, and Ex. G., and that "Opposer's POPMONEY services were discussed on the National Public Radio's (NPR's) Planet Money program, Episode 489: The Invisible Plumbing of Our Economy, which aired on October 4, 2013. Opposer's Senior Vice President, Bert Harkins, was interviewed during this segment." *Id.* at Para. 19. Some other advertising and marketing information was discussed and included in the Stipulation of Facts and the attached exhibits, but again, there was insufficient information as to the context or level of consumer exposure over a length of time.

While it appears that the services associated with Opposer's POPMONEY mark have met with some success in the marketplace, and have been noted for that success, it does not appear on this record that Opposer's mark has risen to the level of a famous mark. Thus, we find this factor to be neutral.

Consumer Sophistication

Applicant urges us to consider the consumer sophistication and degree of purchaser care likely to be exercised for the services at issue in this proceeding. Applicant argues that both parties market their services "primarily to sophisticated" customers, Opposer to "sophisticated banks and financial institutions," and Applicant to "sophisticated merchants and retailers." (Appl's brief at 8). Applicant further asserts that "[t]he only overlap in consumers is the general public who use mobile phone applications to conduct financial transactions." *Id.* at 8. However, the applicable standard of care for a likelihood-

of-confusion analysis is that of the least sophisticated consumer. *Stone Lion Capital Partners, L.P. v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1163 (Fed. Cir. 2014) (affirming that TTAB properly considered all potential investors for recited services, which included sophisticated investors, but that precedent requires consumer care for likelihood-of-confusion decision to be based "on the least sophisticated potential purchasers"); *Alfacell Corp. v. Anticancer, Inc.*, 71 USPQ2d 1301, 1306 (TTAB 2004). As Applicant has noted, this includes the general public. There is no evidence in the record that consumers in the general public of the financial services offered by the parties are sophisticated or would exercise a high degree of care. Moreover, it is well-established that even sophisticated consumers are not immune from source confusion, especially where, as here, the services are identical-in-part. *See Cunningham*, 55 USPQ2d at 1846. Finally, it appears from the record that services of the nature identified by the parties are offered to general public at low prices or even for free.

Accordingly, we deem this factor to weigh in favor of finding a likelihood of confusion.

Lack of Actual Confusion

Applicant argues that there have been no instances of actual confusion despite overlap in the marketplace. We note, however, that while the presence of confusion may be very useful to our analysis, the lack of evidence of actual confusion carries little weight. *J.C. Hall Co. v. Hallmark Cards, Inc.,* 340 F.2d 960, 144 USPQ 435, 438 (CCPA 1965). This is especially true where, as here, the

record is unclear as to the amount of meaningful opportunities for confusion to have occurred among purchasers. *Nike Inc. v. WNBA Enters. LLC,* 85 USPQ2d 1187, 1202 (TTAB 2007).

Applicant first began use of its PMONEY mark "on January 26, 2011." (Stip. of Facts, Para. 6). Applicant has submitted into the confidential record information regarding its customers and advertising numbers at a level comparable to that of Opposer. Applicant is the official sponsor of Professional Golf Association ("PGA") golfer John Huh (*id.* at Para. 35, Ex. X), and a Platinum Level Partner in the Corporate Partner Program of the Sports and Fitness Industry Association (""SFIA"). *Id.* at Para. 36 and Ex. Y. The Stipulation of Facts further states that "Opposer has been an exhibitor at the same show as the Applicant at least twice." *Id.* at Para. 33. Although it continues on to say that while they both attended the Windy City Summit 2014 and Money 20/20 2013, it also states that "Opposer's POPMONEY software and services were not exhibited at the Windy City Summit." *Id.*

While we understand from the evidence that Applicant's PMONEY may overlap in the marketplace with Opposer's POPMONEY, we cannot conclude with any certainty the extent to which there has been a substantial opportunity for actual confusion to occur.

Accordingly, we find this factor to be neutral as well.

Conclusion

Considering all of the arguments and evidence of record as they pertain to the relevant *du Pont* factors, in comparing Applicant's PMONEY mark to Opposer's Registration No. 3848688 (POPMONEY), we conclude that the services are identical-in-part and are therefore likely to be sold through some of the same channels of trade to the same classes of consumers, including those in the general public whom we do not assume to have any heightened level of sophistication. We find the mark POPMONEY to be inherently distinctive, and we find that it has enjoyed some success in the marketplace, although we do not find the mark to be famous. There is no evidence that the shared term, consisting of the letter "P" plus "MONEY," is commonly used by third parties, or that it has an understood meaning in relation to the services apart from the separate term "MONEY" alone. On the balance, we find the factors to weigh in favor of finding a likelihood of confusion.

**DECISION:** The opposition is sustained.