This Opinion is a
Precedent of the TTAB

Mailed:
February 21, 2007

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

The B.V.D. Licensing Corporation
v.
Florencio Rodriguez

_____

Opposition No. 91157529
to application Serial No. 76298187
filed on August 10, 2001

_____

William H. Hollander and Matthew Williams of Wyatt, Tarrant
& Combs, LLP for The B.V.D. Licensing Corporation.

Florencio Rodriguez, pro se. [1]

_____

Before Seeherman, Rogers and Kuhlke,
Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Florencio Rodriguez (applicant) has applied to register

the mark shown below as a trademark for clothing items.

_____

[1] By a filing mailed November 26, 2005, applicant referred to
Oswald & Yap as applicant's "former law firm" and stated that the
firm had been "released."  A brief on the merits was filed
electronically under applicant's own signature on February 10,
2006, but the cover page lists applicant's former law firm in the
correspondence address section.  On August 29, 2006, by an
electronic filing made not with the Board but through TEAS (the
office's filing system for trademark applications), John Tran
revoked a power of attorney granted to himself and William Buus,
both of Oswald & Yap, and appointed Carol A. Gefis of the same
firm as applicant's attorney.  Under the circumstances, the Board
has sent copies of this order to both applicant and Ms. Gefis of
Oswald & Yap.



The application is based on applicant's asserted use of the mark in commerce, with August 17, 1999 asserted as the date the mark was first used and first used in commerce. The goods identified in the application, as amended, are:

> Clothing, namely, shirts, golf shirts, knit shirts, nightshirts, poloshirts, sport shirts, sweatshirts, halter tops, vests, t-shirts and undershirts; pants, trousers, jeans, slacks, sweat pants, overalls and pantsuits; shorts, Bermuda shorts, boxer shorts, gym shorts and sweat shorts; skirts; dresses and gowns; jackets, blazers, raincoats and overcoats; socks; suits, bathing suits, gym suits, jogging suits, jumpsuits, sweat suits, warm-up suits and track suits; underwear, panties, bras, boxer shorts and briefs; bikinis; and infantwear

The B.V.D. Licensing Corporation (opposer) has opposed issuance of a registration to applicant on two grounds. First, relying on Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), opposer asserts that there is a likelihood that consumers will be confused, mistaken or deceived as to the source of applicant's goods and those marketed by opposer under its various BVD marks, registered for various clothing items, in view of the similarity of the respective

marks. Second, relying on Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c), opposer asserts that its BVD marks became famous long before applicant filed for registration of its BHD and design mark, and that use by applicant of his mark will dilute the distinctive quality of opposer's marks, by "blurring the unique association which has heretofore existed between" opposer, its marks and its goods.

Applicant, in an answer to the notice of opposition, denied all its allegations, save for those related to the filing by applicant of the involved application and the eventual publication of the mark for opposition. In applicant's brief, however, applicant admits that opposer has a family of BVD marks. Brief, p. 5.

Opposer alleged in the notice of opposition that it has "been engaged in the manufacture and sale, and in licensing the manufacture and sale, of an extensive line of clothing under the trademark BVD, in various styles." Notice, ¶ 1. In its pleading, opposer relies on six registrations for its marks (shown below) and, during trial, opposer filed notices of reliance on certified copies showing status of and its title to each registration. Office records acknowledge the filing of a Section 15 affidavit for the last five registrations.

| Reg. No. | Mark | Goods | Status |
|---|---|---|---|
| 49,931 | B.V.D. (typed form) | "undershirts and under-drawers" | Issued 2/27/1906; renewed 5/3/2006 |
| 367,184 | B.V. D. | "underwear, shirts, shorts, pajamas and union suits" | Issued 5/9/1939; renewed 7/22/1999 |
| 546,353 | B.V. D. | "hose for men" | Issued 8/7/1951; renewed 5/11/2001 |
| 764,348 | B.V.D. (typed form) | "men's and boys' t-shirts, underwear | Issued 2/4/1964; renewed 3/20/2004 |
| 1,506,049 | BVD | "men's and boy's underwear" | Issued 9/27/1988; Section 8 affidavit accepted 8/25/1994 |
| 1,506,054 | (This mark "…is lined to designate the color red.") BVD | "men's and boy's underwear" | Issued 9/27/1988; Section 8 affidavit accepted 6/30/1994 |

In its brief, opposer listed a seventh registration, but it was not pleaded and a copy was not made of record by notice of reliance (NOR) or through testimony, so it has not been considered.

Also offered into the record by opposer is a notice of reliance on applicant's supplemental responses to discovery requests, "in particular, on Applicant's Response to

Interrogatory No. 3, in which Applicant produced a catalog of products upon which the Applicant's mark is used." Seventh NOR, p. 1. Applicant's catalog, produced in lieu of an interrogatory response, is therefore permissibly made of record by opposer's notice of reliance. See TBMP Section 704.10 (2d ed. Rev. March 2004).

Opposer's eighth and final notice of reliance introduces reprints of information from USPTO databases showing that opposer opposed an application by a third party to register the mark BHD (in typed format), for "hats, tee-shirts, sweatshirts and bandanas," and that when that applicant withdrew the application, the opposition was sustained. While such a judgment would be relevant to any argument for res judicata (claim preclusion) by opposer in a subsequent proceeding against the same applicant, res judicata is not applicable when the adverse party is different, as in this case. Also, as no issues were tried and no opinion issued in the other case, there is no basis for arguing that collateral estoppel (issue preclusion) applies in this case. Thus, while the evidence has properly been made of record pursuant to Trademark Rule 2.122(e) as a copy of an official record of the USPTO, the only relevance of this material is to show that opposer once challenged an attempt to register a mark consisting of the letter portion of the involved mark.

5

In addition to opposer's notices of reliance, opposer filed the transcript of the testimony of Scott Greene, vice president of the "men's and boys' marketing team" for Union Underwear Company, opposer's parent and the licensee of the BVD marks. The testimony was used to introduce 19 exhibits. [Hereafter may be referred to as "Greene test."]

Applicant apparently filed a notice of reliance during his testimony period but, if the Board received it, it was not entered into the record of this proceeding. However, opposer subsequently filed a copy of that notice of reliance. Applicant stated in his notice that he was relying on his own responses and supplemental responses to opposer's first set of discovery requests, on opposer's responses to applicant's first set of interrogatories and requests for production, opposer's supplemental responses to the requests for production, and the deposition of Scott Greene (opposer's witness).

Applicant need not have stated his reliance on the Greene testimony or applicant's supplemental responses to opposer's discovery requests, as once these items were made of record by opposer, either party was free to present arguments based on them. Applicant could not normally rely on his own responses to opposer's discovery requests.[2]

_____

[2] Trademark Rule 2.121(j)(5) provides an exception to this general rule: If fewer than all of the answers to interrogatories, or fewer than all of the admissions, are offered

6

Further, applicant could not normally put into the record by notice of reliance the documents produced by opposer in response to applicant's requests for production.  See Trademark Rule 2.121(j)(3)(ii).  However, as noted, opposer provided the Board with a copy of applicant's notice of reliance and did not at that time object to any portion of it.  In addition, opposer did not raise any objections to applicant's notice of reliance in its brief and, in its statement of the record, referenced all items submitted by applicant with its notice of reliance.  Accordingly, we deem opposer to have stipulated this evidence into the record and we have considered the entirety of applicant's notice of reliance.[3]

### *Findings of Fact*

Based on the evidence of record, we make the following findings of fact.  In these findings, references to opposer should be read as references to opposer or its licensee, the Union Underwear Company, and predecessors:

---

in evidence by the inquiring party, the responding party may introduce under a notice of reliance any other answers to interrogatories, or any other admissions, which should in fairness be considered so as to make not misleading what was offered by the inquiring party.

[3] The copies of applicant's initial responses to opposer's interrogatories do not include responses to interrogatories one or two.  Further, because the response to interrogatory 19 incorporates by reference the response to interrogatory two, we do not have an effective response to interrogatory 19.

Opposer's six pleaded registrations are valid and owned by opposer.

Opposer has made continuous use of the BVD mark, primarily for men's underwear, including undershirts, briefs and boxers, since 1876.[4]

Opposer also uses its mark for pocket T-shirts.

Opposer does not appear to be manufacturing or marketing clothing items for women.[5]

Opposer's mark is placed on packages for its garments and the garments themselves, usually inside the neck or on a care label, in the case of tops, sometimes inside a waistband for woven boxers, "[b]ut on most bottoms, you will have it on the outside" of the waistband because of a fashion trend whereby pants and shorts are worn "lower to the body" and waistbands are "becoming more and more of a fashion statement."[6]

Opposer's products are available nationwide in 850 retail stores of J.C. Penney and through that chain's website, in the Northeast and Southeast through 150 B.J.'s

---

[4] Greene test. pp. 12-13.
[5] In contrast, when the decision issued in B.V.D. Licensing Corp. v. Body Action Design Inc., 846 F.2d 727, 6 USPQ2d 1719 (Fed. Cir. 1988), the Federal Circuit noted that opposer's registrations then also covered clothing items for "the opposite sex." While the identifications in the two oldest of opposer's six pleaded registrations may arguably encompass certain items for women, there was no testimony from opposer's witness about current use of the marks for women's clothing items.
[6] Greene test. pp. 16-17.

Wholesale Club stores, and on the internet through HosieryStreet.com and AmericanIntimate.com.[7]

Opposer's underwear is "a top ten brand" and opposer has sold billions of dollars of underwear over many years.[8]

Opposer has spent millions of dollars advertising and promoting its BVD brand.[9]

Over the years, opposer has placed ads in newspapers, on television, and in national magazines.[10]

In 2003, opposer employed 26 different advertising insertions, with the goal of delivering 83 million consumer impressions.[11]

In tracking studies among consumers, "BVD has always registered in excess of 90 percent awareness."[12]

Opposer's marketing efforts target males aged 25-49 but opposer's products are bought by both males and females, the latter primarily "for their husbands, boyfriends, or for their sons."[13]

Opposer's BVD trademark is derived from the first letters of the last names of the three founders but BVD, with or without periods, has always been the trademark.[14]

---

[7] Greene test. pp. 19-25.
[8] Greene test. pp. 18-19.
[9] Greene test. p. 35.
[10] Greene test. pp. 35-36.
[11] Greene test. pp. 46-48.
[12] Greene test. pp. 26-28.
[13] Greene test. p. 29.
[14] Greene test. p. 68; and opposer's response to applicant's interrogatory number 3, introduced by applicant's notice of reliance.

Opposer's BVD mark has been listed in numerous dictionaries as a trademark.[15]

Opposer's "attitude and usage studies" of consumers of men's underwear reveal that 75 percent of purchasers of basic styles (e.g., a basic white brief or t-shirt) will plan their purchases, while half the purchases of fashion styles will be made on impulse.[16]

A package of opposer's briefs will sell for $13, a package of undershirts for $16-17, and a pocket t-shirt for $7-12.[17]

Opposer is not aware of any instances of actual confusion.[18]

Applicant began selling his products in 1999.[19]

---

[15] Greene test. p. 28 and associated exhibit (BVD production numbers 00001-00003; also introduced by applicant's notice of reliance.)  In addition, we take judicial notice, see University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), of the following entries spanning nearly 20 years:
"**B.V.D.**, Trademark. a brand of men's underwear. Also, BVD's," at p. 287, The Random House Dictionary of the English Language (2d ed. 1987) and at p. 287 Random House Webster's Unabridged Dictionary (2d ed. 2001);
"**B.V.D.** trademark – used for underwear," p. 306, Webster's Third New International Dictionary (1993);
"**BVDs** plural n. trademark a type of boxer shorts," p. 237, The New Oxford American Dictionary (2d ed. 2005); and
"**BVD** A trademark used for undershirts and underpants worn by men and boys.  This trademark sometimes occurs in print with a final 's: 'He will be under constant scrutiny, right down to his BVD's (Los Angeles Times)'," p. 255, The American Heritage Dictionary of the English Language (4th ed. 2006).
[16] Greene test. p. 30; these studies are not limited to opposer's brand or any particular brands.
[17] Greene test. pp. 53-54.
[18] Greene test. pp. 77-78.
[19] Applicant's response to opposer's interrogatory no. 4.

Applicant's goods are not sold in stores but, rather, directly through "www.badhombre, 800-badhombre, mail-order catalogues, trade shows."[20]

The letters BHD in applicant's mark stand for Bad Hombre Designs.[21]

Applicant's target customers are men of all ages and education levels, and 80 percent of his customers are men.[22]

*Opposer's Standing and Priority*

Because opposer has properly made its six pleaded registrations of record, opposer has established its standing to oppose registration of applicant's mark. See Cunningham v. Laser Golf Corp., 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); Lipton Industries, Inc. v. Ralston Purina Co., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

Moreover, because opposer's pleaded registrations are of record, priority is not an issue in regard to opposer's claim under Section 2(d), as to the mark and goods covered by said registrations. See King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). In any event, opposer has proven continuous use of its BVD marks since well prior to any date on which applicant may rely.

---

[20] Applicant's responses to opposer's interrogatory nos. 7 and 8.
[21] Applicant's response to opposer's interrogatory no. 9.
[22] Applicant's responses to opposer's interrogatory nos. 14 and 15.

*Likelihood of Confusion*

We now turn to the question of likelihood of confusion. Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. See In re Majestic Distilling Co., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); see also, In re E.I. du Pont de Nemours and Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). In the analysis of likelihood of confusion presented by this case, key considerations are the similarities of the marks and the fact that the parties' respective goods are in part the same and otherwise closely related. Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

The fame of opposer's BVD marks also is critical in this case. See Recot Inc. v. M.C. Becton, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000) (The "fame of the prior mark, when present, plays a 'dominant' role in the process of balancing the *du Pont* factors" and famous marks therefore "enjoy a wide latitude of legal protection"). See also, Bose Corp. v. QSC Audio Products Inc., 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002) (WAVE and ACOUSTIC WAVE marks

12

found to be famous and entitled to a broad scope of protection). Opposer has used one or more of its registered BVD marks for more than 125 years, a very significant period of use. It has sold billions of dollars of its branded goods, which is particularly significant in view of the relatively low cost of the goods. Opposer has spent millions of dollars advertising its brand and its goods are available nationwide. It is also significant that opposer's BVD mark repeatedly has been recognized in dictionary entries. B.V.D. Licensing v. Body Action Design, supra, 6 USPQ2d at 1720 ("When a trademark attains dictionary recognition as a part of the language, we take it to be reasonably famous").

In a typical Board inter partes case wherein the plaintiff is asserting the fame of its mark, the plaintiff usually will provide detailed sales and advertising figures, broken out by year or in some other manner that is sufficient to illustrate regular sales and advertising over a long period of time. In this case, opposer did not provide such information. We caution that non-specific testimony about sales and advertising might not be sufficient to demonstrate the fame of a mark in the typical case. In this case, however, when the non-specific testimony is joined with the numerous dictionary entries recognizing BVD as a trademark, as well as the extremely

long period of use, we find that the totality of the evidence is sufficient to establish that BVD is a famous mark. In short, the fame factor weighs heavily in opposer's favor.

We next consider the goods, and note that the identification of goods in the involved application includes "t-shirts and undershirts," "socks," "underwear," and "boxer shorts and briefs." These are identical to goods covered by opposer's registrations ("socks" would include "hose for men") and on which opposer uses its mark. Closely related items include applicant's "nightshirts" and opposer's "pajamas."

In regard to applicant's other goods, we note that there are reported cases that found underwear and other clothing items to be related items. See, e.g., Jockey International Inc. v. Mallory & Church Corp., 25 USPQ2d 1233, 1236 (TTAB 1992) (opposer provided evidence that a number of different companies market under the same trademarks both underwear and neckties and opposer's underwear and applicant's neckties were found by both majority and concurring opinions to be related goods for likelihood of confusion purposes). There is no per se rule, however, that such goods must be considered related. See In re British Bulldog, Ltd., 224 USPQ 854 (TTAB 1984). Nor will the Board take judicial notice that items of outerwear

and undergarments are related items for likelihood of confusion purposes.  See In re Sears, Roebuck & Co., 2 USPQ2d 1312 (TTAB 1987).  In this case, opposer has not provided any evidence that its undergarments must be considered related to those clothing items in applicant's identification of goods that are not identical or virtually identical to opposer's goods.  We therefore have focused our analysis only on the identical goods.  Nonetheless, if we find there is a likelihood of confusion as to those goods, then applicant's application must be refused as to the entire class of goods.  See Baseball America Inc. v. Powerplay Sports Ltd., 71 USPQ2d 1844, 1847 n.9 (TTAB 2004) and cases cited therein.  In sum, while there is no evidence that opposer's goods are related to many of applicant's identified clothing items, the fact that even some of applicant's goods are identical to opposer's goods means the similarity of the goods is a factor that favors opposer.

Similarly, because some of the goods are identical and because there are no restrictions in applicant's identification, we must assume that the common goods of opposer and applicant are marketed to overlapping classes of consumers.  See Octocom Systems, Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783, 1788 (Fed. Cir. 1990) ("an application with an identification of goods having no restriction on trade channels obviously is not

narrowed by testimony that the applicant's use is, in fact, restricted to a particular class of purchasers"). Even without the requirement that we make such assumptions regarding classes of customers, the record in this case shows that both parties target men as a primary class of customer. This, then, is another factor favoring opposer.

Applicant does not attempt to reach the parties' common customers through the same retail stores or websites that opposer utilizes. In fact, applicant does not appear to utilize retailers as a trade channel and its website sales appear to be limited to its own website. However, because the parties do not limit the channels of trade in their respective identifications, we must assume that they could use the same channels of trade for these legally identical goods even if they are not now doing so. Kangol Ltd. v. KangaROOS U.S.A., Inc. 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992) ("There is no evidence that opposer's and applicant's goods are currently being sold in the same channels of trade. Yet, in neither the applicant's application nor the opposer's registrations are the trade channels in any way restricted. The issue of likelihood of confusion is resolved by considering the 'normal and usual channels of trade and method of distribution.'") (citations omitted). Thus, we must consider, for purposes of the likelihood of confusion analysis, that applicant could sell

his goods in retail department stores such as J.C. Penney's and warehouse stores such as BJ's, or through websites such as HosieryStreet.com and AmericanIntimate.com, i.e., the outlets through which opposer's goods are sold. The presumptive common channels of trade is a factor that weighs in opposer's favor.

The relatively low cost of the involved clothing items and the fact that they may frequently be purchased on impulse is another factor that increases the likelihood of confusion. See Recot, supra, 54 USPQ2d at 1899 ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care")(citations omitted). This, too, favors opposer.

We turn now to the marks. To determine whether the marks are similar for purposes of assessing the likelihood of confusion, we must consider the appearance, sound, connotation and commercial impression of each mark. Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). In a particular case, any one of these means of comparison may be critical in finding marks to be similar. In re Lamson Oil Co., 6 USPQ2d 1041, 1042 (TTAB 1988); see also, In re White Swan Ltd., 8 USPQ2d 1534, 1535 (TTAB

1988). In addition, it is a well-established principle that, in articulating reasons for reaching a conclusion on the issue of likelihood of confusion, while the marks are compared in their entireties, "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." In re National Data Corp., 732 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

In analyzing the involved marks, we find that the BHD portion of applicant's mark is the dominant portion. It is the visually dominant portion because it is at the top of the mark and is the same size or larger than the image of the man framed by an oval carrier.[23]

Comparing the marks as to appearance, we note that opposer's marks are the letters BVD, presented with or without periods, in upper case, sometimes with color or in a particular font. However, two of the pleaded registrations are for opposer's mark in typed form, meaning we must

---

[23] Plain geometric designs, such as the oval carrier or frame for the design of a man wearing a sombrero would not be seen by consumers as a particularly distinctive element of applicant's mark. In re Anton/Bauer Inc., 7 USPQ2d 1380, 1381 (TTAB 1988) ("In particular, common geometric shapes such as circles, ovals, triangles, diamonds and stars, when used as backgrounds for the display of word or letter marks, are not regarded as trademarks for the goods to which they are applied absent evidence of distinctiveness of the design alone").

consider the possibility of this mark being presented in any reasonable form of display. See <u>Cunningham</u>, supra, 55 USPQ2d at 1847-48, and <u>Jockey</u>, 25 USPQ2d at 1235. It would certainly be reasonable for opposer to use the same font as is employed for the letters BHD in applicant's mark, or to utilize a larger middle letter, as applicant has done. Thus, we must assume that opposer's BVD mark and the BHD portion of applicant's mark could have very similar appearances.

In articulating or speaking the marks, they would be similar in sound insofar as the first and last letters would be pronounced the same and because the design in applicant's mark would not be articulated. Moreover, we agree with the statement of opposer's witness that "with BHD and BVD, as three letters, because you don't have a vowel, you have to identify each individual letter. Neither one can be spoken as a word." Greene test. pp. 52-53. The different middle letter in the marks, and the need for those speaking the marks to speak each letter results in some difference in pronunciation, but that difference is not sufficient to outweigh the overall similarity in the structure of the letters and, as discussed below, the likelihood that consumers will view the letter combinations as arbitrary.

Turning to the connotations of opposer's BVD mark and applicant's BHD and design mark, it has been noted that the derivations of letter marks and acronyms are of no particular significance.  See B.V.D. Licensing Corp., supra, 6 USPQ2d at 1723 (dissenting opinion, J. Nies) citing Aerojet-General Corp. v. Computer Learning & Sys. Corp., 170 USPQ 358, 362 (TTAB 1971) (fact that acronyms are derived from different words unimportant because average purchaser probably unaware of derivation); and 1 J. Gilson Trademark Protection & Practice §5.02, at 5-18 (1987).  See also, authorities collected in Edison Brothers Stores, Inc. v. Brutting E.B. Sport-International GmbH, 230 USPQ 530, 533 (TTAB 1986) ("It should be noted that the lettered marks in almost all of the cited decisions were, as in the case before us, derived from the trade or corporate names of the involved parties, but these facts had no negative influence upon the likelihood of confusion conclusions which were reached.").  Moreover, in this case, the record is clear that opposer does not promote the derivation of its mark and consumers would be likely to view the letters BVD as arbitrary in relation to opposer's goods.

While applicant sometimes utilizes the words BAD HOMBRE DESIGNS in combination with the mark in the involved application, any registration that would issue from the application would not include those words and applicant

20

would not be required to use them.  Thus, we assess the connotation of applicant's mark from the perspective that consumers will see only that which applicant seeks to register.  See Jockey, 25 USPQ2d at 1236 ("applicant's argument that we must compare its mark ELAAN (stylized) with ELANCE plus JOCKEY because 'ELANCE always appears with the Jockey name' is likewise misplaced"); and Blue Cross and Blue Shield Association v. Harvard Community Health Plan Inc., 17 USPQ2d 1075, 1077 (TTAB 1990) ("The problem that we have with applicant's argument is that applicant is not seeking to register a service mark slogan containing its trade name").  Some consumers might wonder what the letters in applicant's mark stand for, but there is nothing to indicate that, absent some other prompt such as use of the words BAD HOMBRE DESIGNS, consumers would routinely understand the letters to have a particular connotation.  We therefore conclude that most consumers would think of the letters in applicant's mark as arbitrary, in the same way that the letters in opposer's mark would be perceived as arbitrary.  The presence of the image of the hatted man contributes to the connotation of the mark as a whole, and certainly lends something to applicant's mark that is not present in opposer's mark.  However, the letters in applicant's mark dominate and any contribution of the design to the connotation and overall commercial impression of

applicant's mark would be outweighed by the dominant letters. See Chemetron Corporation v. NRG Fuels Corporation, 157 USPQ 111 (TTAB 1968), which sustained an opposition to registration of the mark NRG, with a flame design, set in a circle carrier, in view of opposer's prior registrations of NCG per se or with other design elements.

In sum, while the marks have some differences, the overall commercial impressions are very similar.

Several cases state that marks involving letter combinations are likely to be inherently difficult to remember and, therefore, consumers are more susceptible to confusion or mistake than with word marks. See Weiss Associates, Inc. v. HRL Associates, Inc., 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990); and Alberto-Culver Co. v. F.D.C. Wholesale Corp., 16 USPQ2d 1597 (TTAB 1990) and cases cited therein. Confusion of letter combinations is a concern even when the prospective purchasers of the goods are sophisticated purchasers. See Weiss, supra, and Chemetron, supra; Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd., 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers...are not infallible."). It is an even greater concern when the relevant class of prospective purchasers consists of members of the general public, as in the Alberto-Culver case, supra, and in the case at hand. See Spoons Restaurants, Inc. v.

Morrison, Inc._,_ 23 USPQ2d 1735, 1741 (TTAB 1991) ("The proper emphasis is thus on the recollection of the average customer, who normally retains a general rather than a specific impression of trademarks or service marks.") (citations omitted), *aff'd*. No. 92-1086 (Fed. Cir. June 5, 1992); and In re Steury Corporation, 189 USPQ 353 (TTAB 1975). The slight difference in letter combinations may not even be noticeable when, as here, the goods are the subject of impulse purchasing and, because of the fame of the BVD mark for underwear, the expectation of the consumer in seeing a three-letter mark with the initial letter B and the final letter D used on such goods is that the mark will be BVD.

Finally, we note "[w]hen marks would appear on virtually identical goods or services, the degree of similarity [of the marks] necessary to support a conclusion of likely confusion declines." Century 21 Real Estate Corp. v. Century Life of America, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992).

In this case, because of the fame of opposer's mark, the overlapping identifications of goods, the common classes of consumers and channels of trade, the likelihood of impulse purchases, and the similarities in the marks, we find that there is a likelihood of confusion among consumers. The opposition therefore is sustained as to

opposer's claim under Section 2(d) of the Trademark Act. Because we sustain the opposition on that claim, we need not and do not reach opposer's claim of dilution.

Decision:  The opposition is sustained and registration to applicant is refused.