This Opinion is a
Precedent of the TTAB

Mailed:
January 21, 2014

**United States Patent and Trademark Office**

Trademark Trial and Appeal Board

———

*Weider Publications, LLC*

*v.*

*D & D Beauty Care Company, LLC*

———

Opposition No. 91199352
to application Serial No. 85034975

———

Scott E. Thompson and Masahiro Noda, Drinker Biddle & Reath LLP for Wei-
    der Publications, LLC.

Shawn R. Farmer, Clinton J. Cusick and Jon H. Muskin of Muskin & Cusick
    LLC for D & D Beauty Care Company, LLC.

———

Before Bucher, Lykos and Greenbaum, Administrative Trademark Judges.

Opinion by Lykos, Administrative Trademark Judge:

D & D Beauty Care Company ("applicant") filed an application to register the mark SHAPES in standard character format for "beauty salon services; day spa services, namely, nail care, manicures, pedicures and nail enhancements; health spa services for health and wellness of the body and spirit; health spa services for health and wellness of the body and spirit, namely, providing massage, facial and body treatment services, cosmetic body care ser-

vices; health spa services, namely, cosmetic body care services" in International Class 44.[1]

Weider Publications, LLC ("opposer") opposed the registration of applicant's mark on the grounds of (1) priority of use and likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d); and (2) likelihood of dilution by blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c). Opposer in its notice of opposition pleaded ownership of the following registered marks (collectively opposer's "SHAPE mark"): SHAPE in standard character format for "magazine relating to physical fitness and exercise" in International Class 16;[2] and "computer services, namely, providing on-line magazines in the field of health and fitness; and providing information in the field of health and fitness via a global communication information network site" in International Class 42;[3] and the stylized mark displayed below

**SHAPE**

for "DVDs, CD-Roms, audio and video recordings featuring information in the field of nutrition, health and fitness; computer software for instruction and information in the field of nutrition, health and fitness" in International Class

---

[1] Application Serial No. 85034975, filed May 11, 2010, pursuant to Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

[2] Registration No. 1525562, registered on February 21, 1989, alleging December 8, 1980 as the date of first use anywhere and in commerce; Section 8 affidavit acknowledged and accepted; renewed.

[3] Registration No. 2189909, registered on September 15, 1998, alleging April 1997 as the date of first use anywhere and in commerce; Sections 8 and 15 affidavits acknowledged and accepted; renewed.

9;[4] "magazine dealing with health and fitness" in International Class 16; and "computer services, namely, providing on-line magazines in the field of health and fitness; and providing information in the field of health and fitness via a global communication information network site" in International Class 41.[5] Opposer also pleaded ownership of its registration for the mark SHAPE for "clothing, namely, t-shirts and visors" in International Class 25.[6]

In its answer to the notice of opposition, applicant admitted opposer's ownership of its pleaded registrations but otherwise denied the salient allegations therein. Applicant also asserted various affirmative and putative defenses.[7] The case is now fully briefed and has been presented to us for a decision on the merits.

---

[4] Registration No. 2931313, registered on March 8, 2005, alleging April 1, 2004 as the date of first use anywhere and in commerce; Sections 8 and 15 affidavits acknowledged and accepted.

[5] Registration No. 2741626, registered on July 29, 2003, alleging June 16, 1989 as the date of first use anywhere and in commerce for the International Class 16 goods and April 1997 for the International Class 41 services; Sections 8 and 15 affidavits acknowledged and accepted.

[6] Registration No. 1495154, registered on July 5, 1988, alleging May 21, 1984 as the date of first use anywhere and in commerce; Sections 8 and 15 affidavits acknowledged and accepted; renewed.

[7] With regard to the affirmative defense of failure to state a claim upon which relief may be granted, insofar as applicant neither filed a formal motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) during the interlocutory phase of this proceeding, nor argued this asserted affirmative defense in its brief, it is hereby deemed waived. *See Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc. dba Watermark Cruises*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013).

I. *Evidentiary Issues – Opposer's Objections*

Citing Trademark Rule 2.122(d)(2), opposer objects to applicant's Notice of Reliance No. 1 on third-party applications, and applicant's Notice of Reliance No. 3 on applications filed by applicant which are not involved in this proceeding, all of which were obtained from the U.S. Patent and Trademark Office's ("USPTO") Trademark Electronic Application System ("TEAS and TEAS Plus")[8] databases, for failure to show the current status and titles thereof.

Opposer's objection is overruled. As applicant correctly points out, Trademark Rule 2.122(d)(2) governs the submission of registrations, not applications. Trademark Rule 2.122(e) is the appropriate rule for submitting official records, and, as further explained in the Trademark Manual of Board Procedure ("TBMP") § 704.03(b)(2) (3d ed. rev. 2 June 2013), that rule permits the submission of a copy of an application that is not the subject of the proceeding from a USPTO database. Insofar as applicant obtained copies of the applications from a USPTO electronic database, applicant's submission thereof, without more, was proper.

Opposer also objects to applicant's notice of reliance on third-party registrations obtained from a USPTO database as failing to show current status and title of said registrations pursuant to Trademark Rule 2.122(d)(2). Although it appears that applicant served a notice of reliance on third-party reg-

---

[8] For an explanation of the TEAS and TEAS Plus electronic application forms, see Trademark Manual of Examination Procedure ("TMEP") §§ 301 and 819 (Oct. 2013).

istrations on opposer, applicant failed to submit actual copies of the registrations to the Board as required by Trademark Rule 2.122(e).[9] Insofar as the third-party registrations were never filed with the Board, opposer's objection is moot.[10] We remind applicant that it is the duty of the party making submissions to the Board via the Board's electronic filing system ("ESTTA") to ensure that they have been entered into the trial record. *Cf. Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc. dba Watermark Cruises*, 107 USPQ2d 1750, 1758, n.16 (TTAB 2013) ("the onus is on the party making the submissions to ensure that, at a minimum, all materials are clearly readable by the adverse party and the Board"); *Hard Rock Café Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1404 (TTAB 1998). Filers using ESTTA receive both an on-screen and e-mail acknowledgement of receipt from ESTTA with the ESTTA tracking number and the filing information which includes the number of pages transmitted. *See* TBMP § 110.09. Parties are urged to check not only the ESTTA filing receipts but also to check TTABVUE, the Board's electronic docket information

---

[9] The Board records show only the submission via ESTTA of a cover sheet for the notice of reliance but only to comply with the proof of service requirement.

[10] Applicant argued in its brief that the third-party registrations constituted evidence that opposer's pleaded marks are weak and entitled to a limited scope of protection. Consideration of the third-party registrations would not have altered our determination in this case. As we have often stated, because third-party registrations of marks are not evidence that the registered marks are in use, they are of limited probative value for demonstrating weakness of the marks. *See In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010). *See also* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:89 (4th ed. 2009) ("The mere citation of third-party registrations is not proof of third party uses for the purpose of showing a crowded field and relative weakness.").

and file database, to ensure that all documents have been properly transmitted.

## II. *The Record*

Pursuant to Trademark Rule 2.122(b), the record includes applicant's application file and the pleadings.

### A. *Opposer's Evidence*

Opposer properly made of record its pleaded registrations with its notice of opposition. In addition, opposer introduced the testimony deposition of Tara Kraft, Editor-in-Chief of SHAPE Magazine and Shape.com taken on May 4, 2012 with Exhibits 1-4 attached thereto ("Kraft Testimony Deposition").

Opposer also introduced the following evidence via notices of reliance on the following dates:

1.  Notice of Reliance No. 1 filed May 11, 2012 consisting of portions of the discovery deposition of Mohsin Mohammed, Operations Manager for Trends Beauty Group, an affiliate of applicant,[11] taken on February 7, 2012 (Docket Entry #11)[12] ("Mohammed Discovery Deposition");

2.  Notice of Reliance No. 2 filed May 3, 2012 consisting of forty-eight back issues of Opposer's SHAPE magazine from February 2003 to September 2011; and

3.  Notice of Reliance No. 3 consisting of printouts of various web pages from Opposer's website, www.shape.com.

---

[11] Both entities are under the common control of Reema Khan, Mohsin Mohammed's wife.

[12] All docket entry citations refer to TTABVUE, the Board's electronic docket information and file database.

B.    *Applicant's Evidence*

Applicant properly made of record the following evidence via notices of reliance filed on July 11, 2012:

1.  Notice of Reliance No. 1 consisting of third-party applications for SHAPE UP MOM (Serial No. 85404878); U SHAPE HEALTH (Serial No. 85619885); 50 SHAPES WORKOUT (Serial No. 85611521); TAKING YOUR TRUE SHAPE (Serial No. 85461144); RE:NEW RE:SHAPE RE:VITALIZE (Serial No. 85589895); SHAPE UP DIET (Serial No. 77635523); SHAPE THE FUTURE OF OBESITY (Serial No. 79107375); GET YOUR ESS IN SHAPE (Serial No. 85327162); and SYSCO SHAPE (Serial No. 85521105);

2.  Notice of Reliance No. 2 consisting of excerpts from the discovery deposition of Mohsin Mohammed, Operations Manager for Trends Beauty Group, an affiliate of applicant, taken February 7, 2012 ("Mohammed Discovery Deposition");[13]

3.  Notice of Reliance No. 3 consisting of copies of U.S. applications filed by applicant which are not subject to this proceeding, namely, SHAPES (Serial No. 85034985); SHAPING YOU BEAUTIFUL (Serial No. 85370986); SHAPES BROW BAR and Design (Serial No. 85370983); SHE BAR (Serial No. 85034989) as well as a copy of a European Union application, namely SHAPES BROW BAR (European Union Filing) (U.S. Ref. No. A0025374);

4.  Notice of Reliance No. 4 consisting of applicant's prior registrations not subject to this proceeding, namely, SHAPES BROW BAR (Reg. No. 3524808); and SHAPES BROW BAR (Reg. No. 4009339);

5.  Notice of Reliance No. 5 consisting of printouts from various websites obtained through a Google search of "Shape + magazine," "Shape + health" and "Shape + beauty;" and

---

[13] According to Trademark Rule 2.120(j)(4), "[i]f only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party." We find that the interests of fairness are served best by considering the additional excerpts of the Mohammed discovery deposition submitted by applicant under notice of reliance.

6. Notice of Reliance No. 6 consisting of America Media Operations Inc.'s 10-K Reports filed with the Securities Exchange Commission for the years 1997-2005.

III.   *The Parties*

Opposer, Weider Publications, LLC, is a subsidiary of American Media, Inc. and a publisher of a wide variety of print magazines and online content. Applicant's Notice of Reliance No. 6, Docket Entry #71, Securities and Exchange Commission Form 10-K filed in 2005. Much of the editorial content of SHAPE magazine is devoted to health, fitness, beauty and fashion. Kraft Testimony Deposition, 16:9-22; 19:2-25; Ex. 1. With an average monthly circulation of 1.65 million, SHAPE magazine is ranked first among all magazines in the women's active lifestyle category, and fourth among top magazines directed to young women in general. *Id*. at 40:15-22; Ex. 1. Opposer's SHAPE magazine has generated substantial annual revenues since 2009.[14] *Id*. at 63:4-11.

Opposer offers its editorial content across many different platforms. In addition to its printed version, opposer's SHAPE.COM website, which features content and advertising related to the printed magazine, averages approximately three million unique visitors each month. Kraft Testimony Deposition, 43:22-25. Approximately 700,000 individual subscribers receive opposer's electronically distributed SHAPE newsletter weekly. *Id*. at Ex. 1. Opposer also of-

---

[14] Pursuant to the Board's standard protective order, this figure has been designated confidential. We note, however, that applicant did not designate as confidential its sales and advertising figures.

fers apps or "digi-mags" which are specialized downloadable software applications that enable users to read electronic or digital versions of its magazine and view specialized channels devoted to specific topics such as fitness, beauty, home, careers, brides, nutrition and health on mobile phones and tablet computers. *Id*. at 45:5-46:20. For example, opposer's New Year's app that launched in January 2011 has received over 50,000 downloads. *Id*. at 48:10-16. Across all platforms, opposer's SHAPE publications, both in print and electronic form, reach an audience of approximately six million people each month, the vast majority of whom are women. *Id*. at Ex. 1 ("Demographic Profile Page"). The overwhelming majority of readers of SHAPE magazine are females between the ages of 18 and 54, with a median age of 37 and a median household income of approximately $86,000. *Id*. at 37:16-38:9; Ex. 1.

Opposer also periodically sponsors or co-sponsors live events under its SHAPE mark such as the "beauty blowout tour" and "beauty sample sale" in cities throughout the United States wherein services such as make-up touchups, dry hair styling, massages, manicures, pedicures and various beauty products are either given away or sold at a discount. Kraft Testimony Deposition, 61:4-25; Ex. 4; Opposer's Notice of Reliance No. 2 (November 2009 issue of SHAPE magazine, Docket Entry #47, p. 199). Other events such as the "Best Friends Forever (BFF) Girls Getaways," co-sponsored by opposer under its SHAPE mark and Beaches Resorts offers special trips to Caribbean resorts along with gift certificates for spa related services. *See e.g*., Opposer's Notice of Reliance No. 2 (November 2009 issue of SHAPE magazine, Docket Entry #47,

p. 199; September 2010 issue of SHAPE magazine, Docket Entry #56, p. 47). Shape magazine routinely publishes editorial content about spas and spa treatments available in various locales in the United States, Mexico and the Caribbean. *See e.g.*, Kraft Testimony Deposition, Ex. 2 (article entitled "Spa-aah!" in the April 2008 issue of SHAPE magazine); Docket Entry #27, the June 2007 issue of SHAPE magazine, pp. 62-66 (article entitled "Stressed?  The Top 10 Places to Chill Out); Docket Entry #38, June 2008 issue of SHAPE magazine, pp. 49-53 (article entitled "Venture Out: The 10 Best Places to De-stress").[15]

Applicant operates beauty, cosmetology and eyebrow threading salons. It has offered these services since at least September 2007 under the following registered mark: SHAPES BROW BAR for "beauty salons; cosmetology services"[16] and "eyebrow threading services," both in International Class 44.[17] Applicant's Notice of Reliance No. 4. Applicant currently employs approximately 400 people at 62 locations throughout the country, with annual revenues of over $10 million dollars. Applicant's Notice of Reliance No. 2, Mohammed Discovery Deposition, 8:16-18; 11:5-12:2; 26:12. Applicant advertises and promotes its salons and services through radio and Internet ads, direct mail and

---

[15] The latter two articles were in issues of SHAPE Magazine listed in opposer's Notice of Reliance No. 2.

[16] Registration No. 3524808, registered October 28, 2008, alleging September 1, 2007 as the date of first use anywhere and in commerce, with a disclaimer of BROW BAR.

[17] Registration No. 4009339, registered August 9, 2011, alleging September 1, 2007 as the date of first use anywhere and in commerce, with a disclaimer of BROW BAR.

flyers. *Id*. at 28:4-16. Applicant's advertising expenditures in 2011 were approximately $500,000; however, applicant provided no context for these figures in the industry. *Id*. at 30:23-31:25. Applicant has also participated in community events and beauty shows where it operates a booth or kiosk and performs eyebrow threading or other types of cosmetic services. *Id.* at 29:2-22. The typical consumers of applicant's services are females ranging in age between 13 and 70 crossing all socioeconomic categories. *Id.* Applicant has had gross sales of approximately $40 million since 2009. *Id*. at 48:24-49:11.

IV.     *Standing*

Opposer has demonstrated through the USPTO database printouts made of record with its notice of opposition that it is the owner of its pleaded registrations and that the registrations are valid and subsisting. Because opposer's registrations are of record, opposer has established its standing. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

V.      *Section 2(d) Claim*

We will now consider opposer's Section 2(d) claim.

A.      *Priority*

Priority is not in issue in view of opposer's ownership of several valid and subsisting registrations. *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Moreover, applicant does not contest opposer's priority.

B.     *Likelihood of Confusion*

The remaining issue in this proceeding is likelihood of confusion. Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence.[18] We base our determination under Section 2(d) on an analysis of all of the probative evidence of record bearing on a likelihood of confusion. *In re E I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*du Pont*"). *See also, In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). We discuss all relevant *du Pont* factors below.

1.     *Fame*

We begin with the *du Pont* factor of fame of opposer's pleaded SHAPE marks. Fame of the prior mark plays a dominant role in likelihood of confusion cases featuring a famous mark. *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000). Because of the wide latitude of legal protection accorded a famous mark and the dominant role fame plays in the likelihood of confusion analysis, the party asserting fame must clearly prove it. *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594,

---

[18] To the extent if any, that applicant is asserting that opposer must prove that its SHAPE marks are famous in order for opposer to prevail on its likelihood of confusion claim (Applicant's Brief, p. 12), applicant is misguided. Fame is one factor for consideration and if proven is an important element in the *du Pont* analysis.

1597 (TTAB 2009); *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007).

It is also important to note that fame for likelihood of confusion purposes and fame for dilution purposes are distinct concepts. *See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed Cir. 2005) ("*Palm Bay Imports*"). Unlike dilution, fame for likelihood of confusion purposes does not require the opposer to show fame among every segment of the U.S. population. Rather, fame for likelihood of confusion purposes arises as long as a "significant portion of the relevant consuming public ... recognizes the mark as a source indicator." *Id.* at 1694. Fame for likelihood of confusion purposes may be measured indirectly by the volume of sales and advertising expenditures of the goods sold under the mark, for example, and other factors such as length of time of use of the mark; widespread critical assessments; notice by independent sources of the products identified by the marks; and the general reputation of the products and services. *Bose Corp.*, 63 USPQ2d at 1308.

Applicant contends that because opposer has presented neither evidence regarding the impact of its SHAPE marks on the minds of consumers (for example, declarations from consumers or surveys) nor evidence of unsolicited media attention, opposer has failed to prove fame for likelihood of confusion purposes. Applicant also points to opposer's stated annual revenue figures as insufficient.

We disagree. The record shows that opposer has continuously used the SHAPE marks for over 30 years to identify its magazine in print form and for over 15 years to identify its online magazine offered via the Internet; that the average monthly circulation of the print edition of SHAPE magazine exceeds 1.6 million; that the online version of SHAPE magazine and opposer's related Internet website receive on average three million monthly unique visitors; that approximately 700,000 customers subscribe to SHAPE online newsletters offered via SHAPE.COM; and that the overall audience of SHAPE magazine across all platforms is about six million per month. Kraft Testimony Deposition, 43:22-25; Ex. 1. Indeed, opposer presented evidence that SHAPE magazine is the leader in circulation and ad revenues in the women's active lifestyle and health and fitness category. *Id*. Circulation and subscriber figures of this magnitude, coupled with the high volume of unique Internet visits, are compelling evidence demonstrating fame of a magazine in print, online and app form.

In addition, contrary to applicant's assertion, opposer's SHAPE magazine has generated substantial revenues since 2009.[19] It has been named to *Adweek's* "Hot List" for three years in a row and has made the *Ad Age* list of top ten titles. Applicant's Notice of Reliance No. 6, "SEC Form 10-K, 2005," Docket Entry #71. The cost for a single page full color ad for the print edition of SHAPE magazine is over $182,000, and the magazine includes advertisers such as Revlon, Aveda and Burt's Bees. Kraft Testimony Deposition, Ex. 1;

---

[19] As noted earlier, this figure has been designated confidential pursuant to the Board's standard protective order.

Kraft Testimony Deposition 19:7-15. When considered within the context of the circulation figures, we can conclude that advertisers place a premium on running ads in opposer's SHAPE magazine.

Opposer has a significant online presence through its SHAPE.COM website and its digi-mag apps for smart phones, tablets and computers, which provide exposure of opposer's SHAPE mark to millions of consumers each month. Kraft Testimony Deposition, 43:20-45:16 By using mobile app delivery platforms, opposer has expanded the reach of its brand exposure for its SHAPE mark. Opposer's editor-in-chief testified that women are using their computers and tablets more often, which makes access to opposer's digital and electronic content under the SHAPE mark much more portable. *Id.* at 44:6-19.

In addition, opposer has, under its SHAPE mark, engaged in special promotions with third-party entities to hold the "beauty blowout tours" in various cities around the country. Kraft Testimony Deposition, 61:7-25. Also, for the past decade, opposer has, under its SHAPE mark, issued annual "Beauty Awards" for beauty related products; winners such as Clairol for hair coloring and Crest for teeth whiteners place a seal bearing opposer's endorsement on their packaging or advertising materials. *Id.* at 34:17-35:15.

Applicant correctly notes that opposer did not submit direct evidence of consumer recognition of its SHAPE mark such as declarations, surveys or unsolicited media references. There is no requirement, however, that a plaintiff must submit evidence of this nature to prove fame. As explained by our primary reviewing court, the Federal Circuit:

> Direct evidence of fame, for example from widespread consumer polls, rarely appears in contests over likelihood of confusion.
> …
> As to the absence of any consumer surveys, we note that a footnote to the Board's own statement recognizes that direct evidence, such as surveys, is not "required in order to determine whether a mark is famous." Indeed, as noted above, virtually all of our precedent attributing fame to a mark has done so through indirect evidence of the extent to which a mark has earned fame in the consumer marketplace. The fact that little reference is made in our precedent to public consumer polls or surveys is not meant to suggest that such evidence is not probative. Indeed, we think such direct evidence of consumer awareness of products and the marks they bear is preferable to indirect evidence of consumer recognition, from which inferences necessarily have to be drawn. But the absence of such evidence cannot, standing alone, establish lack of fame.

*Bose Corp.*, 63 USPQ2d at 1308. That being said, as evidence of unsolicited third-party recognition, opposer did present evidence that SHAPE magazine has been the recipient of numerous editorial awards for its articles related to health and fitness. Kraft Testimony Deposition, Ex. 1. The record further reflects that opposer's representatives have appeared on nationally recognized television shows such as "The Today Show" and "The Dr. Oz Show" to discuss many of the products reviewed in such articles. Kraft Testimony Deposition, 35:16-37:11; 56:23-57:6. Based on this evidence, we find that opposer's SHAPE marks have been the subject of widespread media exposure.

In sum, we find that opposer has established that its pleaded SHAPE marks are, for purposes of the likelihood of confusion analysis, famous for

magazines in print and online form as well as the provision of related online Internet content.[20] This factor weighs heavily in opposer's favor.

2. *The Marks*

Next, we turn to the *du Pont* likelihood of confusion factor regarding the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *See Palm Bay Imports*, 73 USPQ2d at 1692. "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted).

Applicant in its brief does not address this first *du Pont* factor; nor did applicant present any evidence at trial regarding this factor. Nonetheless, opposer, as plaintiff in this proceeding, retains the burden of proving its case by a preponderance of the evidence.

Opposer asserts that applicant's mark, a pluralized version of opposer's registered SHAPE marks, is "virtually identical" in sound, appearance, meaning and commercial impression to opposer's marks. It is well established that trademarks and/or service marks consisting of the singular and plural forms of the same term are essentially the same mark. *See Wilson v. Delaunay*, 245

---

[20] Opposer did not submit evidence to support a finding that the mark SHAPE is famous for clothing.

F.2d 877, 878, 114 USPQ 339, 341 (CCPA 1957) (finding no material difference between the singular and plural forms of ZOMBIE such that the marks were considered the same mark); *In re Pix of Am., Inc.*, 225 USPQ 691, 692 (TTAB 1985) (noting that the pluralization of NEWPORT is "almost totally insignificant" in terms of likelihood of confusion among purchasers); *In re Sarjanian*, 136 USPQ 307, 308 (TTAB 1962) (finding no material difference between the singular and plural forms of RED DEVIL).

In addition, because applicant applied to register its mark in standard character format, its display is not limited to any particular font style, size, or color, and we therefore must consider that applicant's mark might be used in any stylized display or color scheme, including one that is similar or identical to any lettering style used by opposer. *See* Trademark Rule 2.52(a). *See also Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1353, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011). Opposer, which owns a registration for the mark SHAPE in standard character form, is also entitled to display that mark in any format, including the same font style, size, or color scheme as applicant may use.

As such, we agree with opposer that the marks are confusingly similar in appearance, sound, and overall commercial impression. The first *du Pont* factor therefore weighs in favor of finding a likelihood of confusion.

### 3. *The Goods and Services*

The next step in our analysis is a comparison of the services recited in applicant's application vis-à-vis the goods and services identified in opposer's

pleaded registrations. *Cunningham*, 55 USPQ2d at 1846; *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1783 (Fed. Cir. 1992). Applicant in briefing the case has focused primarily on its provision of beauty, cosmetology and eyebrow threading services under its previously used and registered mark SHAPES BROW BAR. The involved application, however, is for the word mark SHAPES and identifies additional services such as "health spa services for health and wellness of the body and spirit; health spa services for health and wellness of the body and spirit, namely, providing massage, facial and body treatment services, cosmetic body care services; health spa services, namely, cosmetic body care services." It is well-settled that we must restrict our analysis to the goods and/or services identified in the involved application and registration(s). *See Octocom Systems, Inc. v. Houston Computers Services, Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Canadian Imperial Bank of Commerce, N.A. v. Wells Fargo Bank*, 811 F.2d 490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987). With regard to opposer, we shall concentrate our analysis on a comparison of opposer's pleaded SHAPE mark in standard character format as set forth in Registration No. 1525562 for "magazine[s] relating to physical fitness and exercise" and Registration No. 2189909 for "computer services, namely, providing on-line magazines in the field of health and fitness; and providing information in the field of health and fitness via a global com

munication information network site."[21]

It is well established that the goods and/or services of the parties need not be similar or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods and/or services of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods and/or services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. *See Coach Servs.*, 101 USPQ2d at 1722. The issue, of course, is not whether purchasers would confuse the goods and/or services, but rather whether there is a likelihood of confusion as to the source of the goods and/or services. *In re West Point-Pepperell, Inc.,* 468 F.2d 200, 175 USPQ 558, 559 (CCPA 1972); *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984).

In this particular instance, we find instructive the case of *The Conde Nast Publications Inc. v. Vogue Travel,* 205 USPQ 579 (TTAB 1979) ("*Conde Nast*"). In *Conde Nast*, opposer and its predecessors, publishers of *Vogue* fashion magazine, filed an opposition against Vogue Travel's application to register the mark VOGUE for "travel agency services" pursuant to Section 2(d) of the Trademark Act. The Board found that opposer's previously used and registered VOGUE mark to identify magazines was "well-known" and that "travel has

---

[21] We limit our likelihood of confusion analysis to the goods and services for which we found opposer had demonstrated fame.

served as an important feature of the magazine … well prior to any date of first use either claimed or actually established by applicant ….” *Id*. at 581. In considering the issue of whether “the contemporaneous marketing of opposer's fashion magazine and applicant's travel agency services under similar marks would be likely to cause confusion or to cause mistake or to deceive,” the Board observed:

> The objections of an owner of a well-known mark for a magazine, such as opposer's mark here involved, to the subsequent use or registration of the same or similar mark for distinctly different goods or services has on occasion been upheld where the plaintiff has been able to show some connection between its magazine and the goods or services of the defendant such that purchasers would be likely to assume that the defendant's goods or services originated with, or were endorsed by, or were in some way associated with the plaintiff.

*Id.* at 582. The Board then set forth three general situations where such a relationship has been found to exist: (1) cases in which the goods or services of the defendant are of a type normally featured in the plaintiff's magazine and/or there is some type of advertising tie-in between the goods or services of the defendant and those featured in the magazine;[22] (2) cases where the plaintiff's magazines and the defendant's goods or services were of types that

---

[22] *See e.g.*, *Cowles Magazines, Inc. v. The Andrew Jergens Co.*, 115 USPQ 92 (Comr., 1957) (the mark “Look” for face cream, bar soap and liquid detergents was held to conflict with “Look” magazine which featured articles on health, beauty and grooming and was associated with nationwide tie-in promotional campaigns with such products as drugs, cosmetics, toiletries and foods).

are both sold through the same retail outlets;[23] and (3) cases where certain activities concomitant with the publication of the involved magazine led to a conclusion of likelihood of confusion with the defendant's goods or services.[24]

Applying these guidelines, the Board in *Conde Nast* found that the case clearly fell within the first category based on the "renown" of opposer's VOGUE mark coupled with the factual findings that

> applicant's services are travel agency services and travel has served as a significant, albeit not the principle, feature of opposer's magazine for many years, as evidenced by the facts, inter alia, that the magazine has a travel editor and a separate category in the table of contents prominently entitled "TRAVEL"; that every issue contains articles relating to travel, often under a heading containing the word "TRAVEL"; that the magazine also contains advertisements related to travel and a column inviting readers to send for brochures of interest to travelers; and that opposer has promoted the travel aspect of the magazine by the use of promotional packages containing travel articles and/or advertisements from the magazine, which packages are sent to travel agencies and tourism associations throughout the United States … .

*Id.* at 583.

Similarly, we find that the instant case falls squarely within the first situation discussed above, namely, that the services identified in the  application are of the type which are normally featured in opposer's magazine. Applicant

---

[23] *See e.g.*, *The Conde Nast Publications Inc. v. American Greetings Corp.*, 141 USPQ 249 (CCPA 1964) (relationship found between "Vogue" for magazine and "Vogue" for greeting cards because the goods were sold to the same consumers through the same stores).

[24] *See e.g.*, *HMH Publishing Co., Inc. v. Breglia*, 141 USPQ 36 (TTAB 1964) (the mark "PLAYBOYBAR" for bar services was found to conflict with "Playboy" which was used not only on a men's magazine featuring various articles about food and drinks, but also in connection with the operation of night clubs and the sale of merchandise such as cocktail sets, napkins and glasses).

has clearly indicated in its application that it intends to offer health spa related services that promote good health and wellness of the body, as well as specific health spa services such as massage, facial and body treatment services, and cosmetic body care services. Opposer's print and online magazines, digimag apps, and website all include content on this same subject matter. The record shows that roughly 25 percent of the editorial content of each issue of SHAPE magazine focuses on beauty and fashion related topics, 24 percent on health and nutrition, and 26 percent on fitness and sports. Kraft Testimony Deposition, 16:7-22, Ex. 1. Ms. Kraft testified that the proportion of the editorial content reflects SHAPE magazine's philosophy that health and feeling better about oneself are "an extension of looking great." *Id*. at 16:11-22. As she explained:

> We inspire, we believe that women do have the power and strength to achieve what they want. We deliver – and this is very important – actionable tips, so that readers can actually … reach their goals ….
>
> Our voice is extremely authoritative. Everything in Shape is backed up by studies, top experts even from the Mayo Clinic, when it comes to beauty we have on our advisory board dermatologists, plastic surgeons, makeup artists, hair stylists, hair colorists…our readers know that what we are writing in Shape is true and can be trusted.

*Id*. at 16:23-17:16. Advisory board members also include experts on the subject of health spas. *See e.g.*, Opposer's Notice of Reliance No. 2 (November 2010 issue of SHAPE magazine "Advisory Board" members) Docket Entry #58. Ms. Kraft further provided examples of such "actionable tips," which appear routinely in SHAPE magazine on all platforms, such as recommendations regard-

ing massages for tight muscles or sport injuries; products for treating acne and wrinkles; and recommendations for "healthy vacation" destinations because "for your overall well-being – beauty, mind, spirit, confidence, relaxation, fitness, … these all go hand in hand … ." Kraft Testimony Deposition, 18:2-23.

With regard to advertising content, approximately 30 percent of the advertising in each issue of SHAPE magazine is for beauty and fashion related goods or services (such as skin care and salons), and 12 percent is for fitness, with a "huge trend" in medispas. *Id.* at 16:9-22; 19:2-25, Ex. 1. The masthead pages for the magazine, as shown in the samples provided by opposer in its Notice of Reliance No. 2, indicate that it has a beauty/fashion editor and director.

In addition to opposer's testimony that opposer's SHAPE magazine contains a substantial amount of material on the subjects of health spas and services, opposer made of record numerous issues of SHAPE magazine dating back to early 2003, virtually all of which contained specific editorial reviews of health spas and spa services at various locations. Ms. Kraft testified that SHAPE magazine has featured extensive stories on spas because its readership has a relatively high income and can afford to go to such spas and partake of the services offered. Kraft Testimony Deposition, 21:20-25. Such articles typically discussed where the spa was located, the various services offered (for example facial peels, mud wraps, and reflexology) and pricing information for the services. Illustrative examples are as follows:

a.  April 2003: Article entitled "Spas in Paradise," Docket Entry #23, pp. 61-64 (Reviews of spas and spa services available in Hawaii, Florida, Georgia, the Bahamas, Bermuda and Mexico);

b.  November 2003, Docket Entry #25: Two articles (1) p. 39 "A Pampering Paradise" (review of the Four Season Resort Aviara spa in Carlsbad, CA) and (2) pp. 55-63, "6 Cool Hot Springs" (review of spas that offer mineral baths in California, British Columbia, New Mexico, Arkansas and Virginia);

c.  June 2007: Article entitled "Stressed? The Top 10 Places to Chill Out," Docket Entry #27, pp. 61-66 (reviews of spas and spa services in Florida, Georgia, New Mexico, Montana, Florida, New York, Pennsylvania and the Caribbean);

d.  April 2008: Exhibit 2 to the Kraft Testimony Deposition, Article entitled "Spa-aah!" (review of the top seven spa treatments, and information on where to get the treatments and the cost); and

e.  June 2008: Article entitled "Venture Out: The 10 Best Places to De-stress," Docket Entry #38, pp. 49-53 (review of spas and spa services in Georgia, New Mexico, U.S. Virgin Islands, North Carolina, Colorado, Arizona, Illinois, Nevada, Florida and Mexico).

In addition to the editorial review of spas, opposer has cross-promoted its SHAPE magazine with spa operators and has even offered giveaways and contests on its SHAPE.COM website to spa destinations. See e.g., advertisement promoting a give-away contest to the Boulders Resort and Golden Door Spa in Carefree, AZ, Docket Entry #38, p. 214; advertisement promoting a give-away contest to the Radisson Aruba Resort, Casino and Spa, Docket Entry #59, p. 13.

Opposer also periodically sponsors or co-sponsors live events under its SHAPE mark such as the "beauty blowout tour" and the "bikini body tour" in which many of the services one would expect to be offered in a spa or salon, such as make-up touchups, hair styling, massages, manicures, pedicures and

foot reflexology, are performed (Kraft Testimony Deposition, 25:12-26:18; 61:4-25), and the "Best Friends Forever Girls Getaways," an event co-sponsored by SHAPE magazine and Beaches Resorts, where special trips are offered to exotic resorts that come with gift certificates for use of the resort's spa services. *See e.g.*, the August 2008 issue of SHAPE magazine, Docket Entry #36, p. 147; the November 2009 issue of SHAPE magazine, Docket Entry #47, p. 199; September 2010 issue of SHAPE magazine, Docket Entry #56, p. 47.

Applicant argues that *Conde Nast* is not controlling here, relying upon a non-precedential decision, *Advance Magazine Publishers, Inc. v. Ray Brown*, Opposition No. 91118342 (TTAB 2003) where the Board found no relationship between opposer's GQ magazine and applicant's GQ NAILS for nail salon services on the basis that the primary readers of GQ magazine were men and the subject matter was primarily for them, while the primary customers of the nail salon services were women. Applicant's Brief, pp. 14-15. Aside from the fact that we did not designate the *Advance Magazine* decision as precedential, we point out that in the present case, the evidence clearly shows that the readership and subject matter of opposer's magazine and its online services are directed to women, as are applicant's services.

In summary, every issue of opposer's SHAPE magazine that opposer submitted as evidence features significant content and advertising on the subjects of beauty, health and wellness; opposer routinely reports on and cross-promotes health spas and health spa services in SHAPE magazine articles and contests; such articles include reviews and tips on health spas, massages, faci-

al and body treatment services, and cosmetic body care services (services identical to those recited in applicant's application); opposer has engaged in commercial tie-ins with spa resorts under its SHAPE mark; and opposer has engaged in these activities for many years and well before either applicant's actual or constructive use date (i.e. the filing date of the application subject to this opposition proceeding). Indeed, the logical underpinnings of *Conde Nast* are equally, if not more relevant, in the digital age with the delivery of magazines now also available via websites and mobile apps. This exposure across multiple platforms reinforces the related nature of the involved goods and services. Therefore, we find that under the analysis of *Conde Nast*, opposer has shown a close relationship between the types of articles that routinely appear in its SHAPE magazine and the services identified by applicant in its application. This *du Pont* factor therefore also favors finding a likelihood of confusion.

### 4. *Channels of Trade and Classes of Customers*

Next we turn to an analysis of the relevant trade channels. This factor also looks at the classes of customers targeted by the parties. *See, e.g., Coach Servs.*, 101 USPQ2d at 1722. At the outset, we acknowledge that the parties' respective goods and services, as identified, travel in distinct trade channels. *See Octocom Systems*, 16 USPQ2d at 1787; *Bison Corp. v. Perfecta Chemie B.V.*, 4 USPQ2d 1718 (TTAB 1987). As the record evidence shows, the ordinary trade channels for applicant's services are full service beauty salons, shopping mall kiosks, and free standing stores in shopping centers. Mohammed Discovery Deposition, 11:5-12:2. Applicant has also offered its services at live com-

munity events, musical events and beauty shows, and advertises its services via the radio, the Internet and direct mail advertisements and flyers. Id. at 28:4-29:10. The ordinary trade channels, as reflected in the record, for opposer's print edition magazine are newsstands, retail outlets, and subscriptions by mail. *See e.g.*, p. 4 of the 2005 Securities and Exchange Commission Form 10-K, Applicant's Notice of Reliance No. 6, Docket Entry #71.

Nonetheless, the record shows that both opposer and applicant target the same demographic audience. The primary readers of opposer's print and online magazine and its associated website are women between the ages of 18 and 54 most of whom are employed and have a relatively high household income. Kraft Testimony Deposition, 37:23; Ex. 1 "Demographic Profile." The primary customers of applicant's services are women of all ages – "age 13, 14 to about 65, 70" at all socioeconomic levels. Mohammed Discovery Deposition, 29:13-22. Thus, the record demonstrates that both applicant and opposer are marketing and advertising their respective goods and services to the same potential consumers, namely, women of essentially the same or overlapping age span, thereby providing an opportunity for confusion. On balance, we find that this factor also weighs in favor of finding a likelihood of confusion.

5.      *Sophistication of Consumers*

Next we consider the conditions under which the goods and services are likely to be purchased, e.g., whether on impulse or after careful consideration, as well as the degree, if any, of sophistication of the consumers. Purchaser sophistication may tend to minimize likelihood of confusion. Conversely, impulse

purchases of inexpensive items may tend to have the opposite effect. *Palm Bay Imports*, 73 USPQ2d at 1695.

Applicant argues that consumers of opposer's magazines, which now retail for $ 4.99, are more likely to make impulse purchases, whereas prospective consumers of beauty salon services "may tend to be more deliberate" in their purchasing decision. Applicant's Brief, p. 16. However, applicant offered no testimony or evidence supporting this contention, such as how it prices its services, or how consumers may choose to select applicant's services over those of others. We therefore find this *du Pont* factor neutral.

### 6. *Third-Party Uses*

Applicant contends that opposer's pleaded SHAPE marks are weak and therefore entitled to a limited scope of protection. In support thereof, applicant has submitted copies of third-party applications as well as Internet evidence consisting of excerpts from third-party websites and Google search engine summary results.

"The purpose of a defendant introducing third-party uses is to show that customers have become so conditioned by a plethora of such similar marks that customers have been educated to distinguish between different such marks on the bases of minute distinctions." *Palm Bay Imports*, 73 USPQ2d at 1694.

At the outset, we note that the third-party applications submitted by applicant are of no probative value here; they merely serve to show the filing of each application. *See, e.g., Nike Inc. v. WNBA Enterprises LLC*, 85 USPQ2d

1187, 1201 (TTAB 2007); *Glamorene Products Corp. v. Earl Grissmer Co.*, 203 USPQ 1090, 1092 n.5 (TTAB 1979). In this instance, however, applicant has also submitted evidence from third-party Internet websites of actual use of the term "Shape," either as a stand-alone mark or as a formative part. Applicant's Notice of Reliance No. 5, Docket Entry #64. We shall consider applicant's evidence with the caveat that those submissions consisting solely of results from the Google search engine are, at best, of limited probative value, because they do not show the context in which the term or phrase is used on the listed web page. *See In re Bayer AG,* 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007); *In re Thomas Nelson, Inc.,* 97 USPQ2d 1712, 1715 (TTAB 2011).

Applicant's evidence of third-party use of the single term SHAPE to identify print or electronic versions of magazines is of limited probative value because the subject matter of each publication is highly specific to a particular industry unrelated to that of opposer's publication. Notice of Reliance No. 5 (see, for example, excerpts obtained from SAPAGROUP.COM for electronic magazine concerning aluminum product manufacturing; ISSUU.COM for electronic and video gaming magazine; SHAPE2DAY.COM for magazine devoted to community life topics for the Supreme Headquarters Allied Powers Europe or "SHAPE", an agency related to the North Atlantic Treaty Organization (NATO) based in Belgium.[25] See also Notice of Reliance No. 5 (excerpt from

---

[25] The Facebook page printout for SHAPE HEALTHCARE FACILITY also appears to be part of the NATO Supreme Headquarters Allied Powers Europe command in Belgium.

TOYDIRECTORY.COM showing "Shape Stretches" for use in connection with a children's game).

Applicant's evidence from the website ESCAPETOSHAPE.COM also is of limited value. Applicant's Notice of Reliance No. 5. Although the excerpts show use of the phrase "Escape to Shape" for "traveling fitness spas", services which are related to applicant's identified services, "Escape to Shape" conveys a commercial impression of a destination, which is quite distinct from the commercial impression conveyed by opposer's single word mark SHAPE.

Likewise, applicant's evidence from the SHAPEHEALTHFITNESS.COM, SHIPSHAPEBODY.COM, INSHAPECLUBS.COM and SHAPEITFITNESS.COM websites, which constitutes the remaining evidence of third-party use, is not particularly probative. While the websites relate to health and fitness clubs, which are frequent subjects of opposer's print and online magazines and website, the websites use the word "Shape" in the context of multi-word composites or phrases that in their entireties convey different commercial impressions from opposer's SHAPE mark.[26]

Furthermore, while we acknowledge that SHAPE has some suggestive significance in the area of health and fitness, as discussed previously, opposer's mark SHAPE has achieved such a degree of fame that, when used in con-

---

[26] Applicant has also submitted printouts from WIKIHOW.COM, LIFEHACK.ORG, ABOUT.COM and HEALTH.COM which use the term "Shape" as part of a headline for news articles generally related to exercise and fitness. Notice of Reliance No. 5. This evidence does not constitute third-party trademark or service mark use and therefore is of limited probative value.

junction with opposer's magazines in print and online form as well as the provision of related online Internet content, it is a distinctive mark that signifies only opposer as the source.

In sum, based on the limited probative evidence of third-party usage we find the *du Pont* factor of the number and nature of similar marks in use on similar goods and services to be neutral.

### 7.     *Actual Confusion*

Applicant has argued that the absence of evidence relative to instances of actual confusion weighs against a finding of likelihood of confusion. Applicant contends that it has operated beauty salon services under the SHAPES BROW BAR mark since 2007 without any instances of actual confusion. However, the test under Trademark Act Section 2(d) is whether there is a likelihood of confusion. It is not necessary for opposer, as a plaintiff in an *inter partes* proceeding, to show instances of actual confusion to establish likelihood of confusion. *Weiss Associates, Inc. v. HRL Associates, Inc.,* 902 F.2d 1546, 14 USPQ2d 1840, 1843 (Fed Cir. 1990); *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390, 396 (Fed. Cir. 1983).

Moreover, as noted above in our discussion regarding the parties' marks, the relevant mark for purposes of this analysis is the one in the opposed application, SHAPES in standard characters, not applicant's previously used and registered design mark SHAPES BROW BAR. The opposed application is based on an allegation of an intent to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). Applicant's own representative

testified that applicant has not yet used this mark. Opposer's Notice of Reliance No. 1, Mohammed Discovery Deposition, 37:14-20. Therefore, there has been no opportunity for confusion to have occurred. Applicant has also expanded the scope of the services it intends to offer from those listed in its prior existing registrations for SHAPES BROW BAR.[27] Accordingly, the lack of evidence of actual confusion is not persuasive, and this factor is neutral.

### 8.    *Balancing the du Pont Factors*

In a particular case, any of the *du Pont* factors may play a dominant role. *In re E. I. du Pont de Nemours & Co.*, 177 USPQ at 567. In the present case, the salient factors are the fame of opposer's marks; the relatedness of opposer's and applicant's goods and services; and the high degree of similarity in the marks. We find that consumers familiar with opposer's SHAPE print and online magazine and website would be likely to believe, upon encountering applicant's mark SHAPES for "beauty salon services; day spa services, namely, nail care, manicures, pedicures and nail enhancements; health spa services for health and wellness of the body and spirit; health spa services for health and wellness of the body and spirit, namely, providing massage, facial and body treatment services, cosmetic body care services; health spa services, namely, cosmetic body care services" that the goods and services originate from, are associated with, or are sponsored by the same entity.

---

[27] Applicant's prior Registration No. 3524808 covers only beauty salons and cosmetology services; applicant's prior Registration No. 4009339 covers only eyebrow threading services.

Accordingly, we find that opposer has proved its Section 2(d) claim by a preponderance of the evidence.

**Decision**: The opposition is sustained on opposer's Section 2(d) claim. In view thereof, we need not consider opposer's dilution by blurring claim.